The opinion of the court was delivered by
Blanchard, J.
This is a contest over four bonds of the city of New Orleans, valued at four thousand dollars.
Plaintiff claims the ownership of the bonds, brings this action, sequesters the bonds and prays judgment decreeing his ownership and awarding him possession.
The defence is that Mrs. Darcourt, defendant herein, is the owner of the bonds.
The judgment below was in favor of defendants, and plaintiff appeals.
Jean Baptiste Rayssiguier, generally known as Louis Rayssiguier, a native of France, came to New Orleans years ago and settled there. He was poor, bat by patient industry, frugality and economy, built up a little fortune and became a property holder.
He married and one child was born to him, which, however, died in infancy.
He became estranged from his wife and was separated from her for a period of about two years before his death.
He died June 8, 1896, intestate and non compos mentis. He had been ill a long time. His disease was softening of the brain. Some three or four months before his death his mind became greatly affected, was unsettled and wandering. He became bereft of memory, was in a state of complete mental inertia and entirely unfit to attend to his business.
Dr. Souchon, a reputable physician who attended him, rightly con-sidered it is his duty to report his condition to the French consul and to the other Frenchmen who were friends of the sick man.
The person and property of the invalid.required the attention and oversight of some one legally authorized to perform such duty. •The physician advised his interdiction. Proceedings to this end *1629 were instituted, but before completed the sick man, whose illness had taken a sudden turn for the worse, died. His succession was opened, and this action is brought by the administrator thereof. Subsequently, the sister of the deceasd, Marie Rayssiguier, Widow Calaxte Victor Molliere, a resident of France, was recognized as his sole heir, and caused herself to be substituted as plaintiff herein.
During his last illness, and for a long time prior thereto, the constant attendant of the deceased was Jules Luminet, the brother of Mrs. Darcourt, defendant herein. Luminet was the close friend as well as the nurse of the sick man, who seems to have relied upon him for attention to his business affairs as well as attendance upon his person. He was at once his adviser, confidant and business manager.. Eleven months after the death of his master Luminet himself died. We are thus deprived of the light which his testimony could have shed upon the doubtful phases of this case. The suit had been filed months before his death, but had not come up for trial and his testimony had not been taken.
The bonds in question had been purchased by Rayssiguier through a broker in February, 1894. The price paid was four thousand dollars.
According to the contention of the plaintiff, Rayssiguier never parted with the ownership and possession of the bonds, but kept the same in a combination safe at his house, from which, during his illness and mental incapacity, they were, without his knowledge or consent, extracted, to subsequently, and after his death, turn up in the possession of defendants under claim of ownership by Mrs. Darcourt, one of them, and that Luminet, her brother, had a hand in the matter.
The contention of the defendants is that on September 2, 1894, seven months after his purchase of the bonds, Rayssiguier sold the same to Mrs. Darcourt, that she paid him four thousand dollars in cash for them, that they were then and there delivered to her, and have been lawfully in her possession ever since.
The appearance of Paul L. Fourehy as defendant herein is explained by the fact that he was the legal counsel of Mrs. Darcourt and as such the bonds had been placed in his hands for collection. Being found in his possession they were sequestered there, and he, together with the party for whom he held them, whose name he had been required to disclose, were made parties defendant.
*1630 There is no dispute that Rayssiguier was in the full possession of his mental faculties in September, 1894, when, as alleged by defendants, he sold the bonds to Mrs. Dareourt.
The evidence shows he was still in possession of his faculties in March, 1895, more than six months later, and able to take care of himself mentally and physically.
But that his mind was even then weakening under the insidious attacks of his disease is shown by the fact that he had forgotten the combination of his safe, and it became necessary to call in an expert to open it. Mr. A. Roy performed that service on March 12, 1895, and, called as a witness by plaintiff, testified that at that time Rays-siguier was “ very rational.” He states that after opening the safe he gave the combination to both Rayssiguier and Luminet, his attendant.
According to plaintiff the bonds were at that time in the safe, but there is no evidence of the same.
According to defendant the bonds were at that time not in the safe, but in the possession of Mrs. Dareourt, at her house, and such is her testimony.
Plaintiff’s case is plausible in the theory on which it rests, but must give way before the uncontradicted facts established by the unimpeached testimony of defendants’ witnesses. That the case is not free from doubt must be .admitted; but the preponderance of evidence and probability resolve this doubt in favor of defendants’ side of it.
Mrs. Dareourt’s testimony of the fact of the purchase, when and where and how consummated, is clear and unequivocal. Concerning her, the District Judge, in whose presence she testified, says: “I never saw a witness in court whose demeanor and conduct on the stand impressed me with more confidence in the truth of the statements made, and I have no doubt of the entire truth of all she stated.’’
She told how she became possessed of the money with which the purchase was made; how little by little it had been accumulated from gifts of funds made by her husband when he was prosperous, and how she had put it away and saved it until it had amounted to the sum of four thousand one hundred dollars; and how, taking four thousand dollars of it, and leaving a balance of one hundred dollars in the wooden box at her house, where it had been kept, she, with her mother-in-law, went to the house of Rayssiguier and *1631 effected the purchase of the bonds, taking his receipt for the money paid him for them. She produces this receipt, swears it was written then and there by her mother-in-law, and that she saw Rayssiguier affix his signature to it. She offered various other receipts executed by Rayssiguier for money paid him by his tenants, in order to prove by comparison of handwriting the genuineness of his signature to the receipt given her when she paid the money for the bonds.
All these receipts came up in the original, and the comparison of handwriting bears out her contention.
Are we to reject her testimony, hold she has perjured herself and that her brother, Jules Luminet, betrayedhis employer’s confidence, acted the scoundrel by filching these bonds from the safe and delivering them into the possession of his sister?
To reverse the judgment herein we would be required to do this. Plaintiff might have some ground for demanding this, did her testimony stand alone and uncorroborated. It has rightly been held that the testimony of a party in his own favor to establish a large claim against a succession is to be received with the greatest caution ; that it is, in itself, of the weakest character, and unless strongly corroborated can not serve as a basis for a judgment of recovery. Cutter vs. Succession of Collins, 37 An. 95.
But this is not a “ claim against a succession ” in the sense as used in that case. The testimony of Mrs. Darcourt is here used as a shield of defense against the attack of the representative of the succession, and in vindication of her possession of the bonds and her claim to their ownership. The presumption of ownership arises from the possession of a movable (19 An. 13), and her testimony in the case was essential to sustain this presumption against the assault of the plaintiff.
But her testimony stands not alone and uncorroborated.
It is corroborated by the testimony of E. C. Kelly, a lawyer, who states that the husband of Mrs. Darcourt, about the date of her purchase of the bonds, consulted him as to the legal requisites in effecting such a purchase, telling him at the time that his wife wanted to purchase bonds.
It is corroborated by the testimony of P. L. Fourchy, also an attorney, who states that Mrs. Darcourt herself had a conversation with him, about that time, in regard to the manner of purchasing bonds, and told him she had the opinion of Mr. Kelly on the subject.
*1632 It is corroborated by the receipt of September 2, 1894, for four thousand dollars for four city bonds, signed by the deceased, and the fact that it is not stated in this receipt from whom the money was received, but. simply that four thousand dollars had been received for four city bonds, does not invalidate it as an acknowledgment of the deceased, that he did not receive that much money for the bonds. From whom received is supplied by the testimony.
Besides the proven signature of the deceased to the receipt, its genuineness is further demonstrated by the fact that the paper upon which it is written is identical in texture, make and appearance with the paper used by him in various receipts which he had given to other parties for money paid him.
Mrs. Darcourt’s testimony |is further corroborated by the fact that the city paid her interest on the bonds, one hundred and twenty dollars, after she got possession of them. It is true it is she who testified to this payment, but she tells how the money was paid. She went to the City Hall and there a cheek for the one hundred and twenty dollars was given her on the State National Bank, and she collected it herself at the bank.
If this was false, plaintiff could have demonstrated it by ruling the bank or the city authorities to produce this canceled check. It Was not done.
It was unfortunate that'the mother-in-law, who was present when the money was paid and the bonds purchased, was not produced as a witness.
She should have been placed on the stand by defendants, and they failing to do so, by plaintiff.
Plaintiff’s counsel 'insist that the failure to produce her as a witness by defendants militates greatly against their case. And so it does.
But does it overthrow their case?
We can not hold that it does when the case is otherwise made out.
Nor will the failure to call a witness justify an arbitrary presumption of suppression. Wharton on Evidence, p. 126V.
Rayssiguier received four thousand dollars for the bonds in September, 1894. When he died in June, 1895, nine months later, all the cash that could be found belonging to him was six hundred and fifteen dollars and eighty cents.
How was the other used; what became of it? Plaintiff urges that *1633 this is a circumstance detrimental to defendants’ case, and it is not without weight.
Nevertheless, the failure to ñnd more of the money at his death is not incompatible with the theory of the sale of the bonds nine months before.
It could have been disposed of by Rayssiguier in various ways. For a period of six or seven months following the sale of the bonds he was rational and entirely able, mentally and physically, to care for himself and his property, and to dispose of the latter as he saw fit. It is just- as plausible, too, to suppose that the money could have been stolen as that the bonds were stolen.
Judgment affirmed.
Nicholls, O. J., takes no part; having been absent at the argument of the case.