No. 2290

Second Circuit

---

TOWNSEND v. MISSOURI PACIFIC RAILROAD COMPANY

---

(November 7, 1925, Opinion and Decree)
(April 19, 1925, Rehearing Refused)

---

(*Syllabus by the Editor.*)

1. Louisiana Digest—Railroads—Par. 58.

It is the duty of the employees of a railroad company to use ordinary care and precautions to prevent injury to persons or property at crossings even though these crossings are used very little.

2. Louisiana Digest—Railroads—Par. 61.

Making a flying or running switch is particularly dangerous under any circumstances. Therefore, where a gondola car, while making a flying switch, collided with a Ford truck on a crossing, employees of the railroad are negligent even though the crossing was used very little.

3. Louisiana Digest—Railroads—Par. 63, 64.

It is negligent for the driver of an automobile truck to back the truck onto a railroad track without being sure that there was no train or car approaching. Where his view is obstructed he should leave the driver's seat and walk to a point where he can obtain clear view of the track before backing his truck on it.

4. Louisiana Digest—Railroads—Par. 64.

It is not only the duty of one about to cross a railroad track to stop, look and listen once, but it is also the duty to continue to keep a watch of the track.

5. Louisiana Digest—Negligence—Par. 25.

Contributory negligence on the part of the plaintiff defeats recovery.

6. Louisiana Digest—Railroads—Par. 66.

The doctrine of last clear chance does not apply to the train crew where there is no evidence to show that they were cognizant of the peril of the driver of the automobile truck and could have avoided the collision with it.

7. Louisiana Digest—Evidence, Par. 42; Railroads—Par. 80.

Where litigant has an opportunity of producing a witness and fails to do so the presumption is that the testimony of such witness would be against him, but this does not constitute an admission that the testimony would have been against him.

Appeal from the Ninth Judicial District Court of Louisiana, Parish of Rapides, Hon. John A. Williams, Judge.

Action by Sidney a Townsend against the Missouri Pacific R. R. Company for damages for personal injuries arising out of a collision between a gondola car of the railroad and a Ford truck. There was judgment for plaintiff and defendant appealed.

Judgment reversed.

Overton and Hunter, of Alexandria, attorneys for plaintiff, appellee.

Hudson, Potts, Bernstein and Scholars, of Monroe, attorneys for defendant, appellant.

ODOM, J.    This is a personal injury suit growing out of an accident which occurred at Tioga, Louisiana, on July 9, 1923, in which a Ford truck, occupied and driven by plaintiff, was struck by a gondola or coal car on a spur or switch track of the defendant company, resulting in serious injury to the plaintiff.

Plaintiff brought suit for $20,000. The case was tried before the court in May, 1924. The court found for plaintiff and gave judgment against the defendant for the sum of $6,000. Defendant has appealed.

Plaintiff was employed by the Lee Lumber Company to deliver ice, for which purpose he used a Ford truck.

He alleges that while driving this truck over what is termed the "Government" spur track of the defendant company at a public crossing the defendant, through "gross fault and negligence" kicked back a string of cars along said track, striking said truck directly behind the driver's seat, demolishing it and hurling plaintiff from said truck to the ground, inflicting upon him serious injuries.

And it is alleged—

"That said cars were kicked down said Government track without blowing a whistle, ringing a bell or any prior warning of their approach having been given, and without any lookout, or, if any lookout, a totally ineffective lookout stationed upon said cars, and without any flagman stationed upon the ground at said crossing to protect the travelling public in the use of the same."

And it is further alleged that said cars were sent down said track at an excessive rate of speed of about fifteen miles an hour.

It is especially alleged—

"That said accident and collision occurred without any fault or negligence on the part of your petitioner; that your petitioner was free from all blame; that said accident and collision and resultant injury to your petitioner were due to the gross fault and negligence of defendant railroad company."

And it is further alleged—

"That in the event it should be averred and proved that your petitioner was guilty of any contributory negligence, which contributory negligence is denied, then in such event and in such alternative your petitioner shows that said railroad company had the last clear chance to avoid said collision and resultant injury."

Defendant, in answer, denied especially that the roadway where the accident occurred is a public crossing and denied plaintiff's allegations of fault and negligence and especially pleaded defendant's contributory negligence in backing the truck onto the railroad track without exercising due precautions.

## OPINION

Defendant's main line of railroad runs approximately north and south through Tioga, Louisiana, a village with a population of about 500. About one-half of the inhabitants of that village live on the east side of the track and the other half on the west side. Its depot is on the east side. Defendant's right-of-way line runs parallel with and about 100 feet east of the line of railroad. All the property, it seems, east of the right-of-way line and contiguous thereto is owned by the Lee Lumber Company, a sawmill concern, where its saw and planing mills are located together with lumber shed, lumber yard, warehouse and an office building and one other building in close proximity thereto.

There is also built on the Lee Lumber Company's property, very close to defend-

ant's right-of-way, a barber shop and an ice house with an alley between them twenty feet wide; this alley running approximately east and west.

The switch called the "Government" spur track branches off from the east side of the main line of railroad a distance of about 440 feet north of the north side of the barber shop (the barber shop being north of the ice house) and runs on the east side of these two small buildings.

Coming from the east, there is a roadway which crosses the "Government" spur track opposite the twenty-foot alley above mentioned.

It was at this crossing that the collision between the truck occupied by the plaintiff and the defendant's gondola or coal car took place.

Branching off from the west side of this "Government" spur track at a distance of about 300 feet from the barber shop is another switch track which runs in the same general direction as the other spur track and the main line. This is designated on the plats in evidence as the "back track".

Just a few feet north of the barber shop another switch track branches off from the last mentioned "back track"; making two switch tracks, designated as "Missouri Pacific No. 1" and "Missouri Pacific No. 2", both of which run west of the barber shop and ice house, so that these two buildings are between these two tracks and the "Government" spur track.

A public highway, built and maintained by the parish, runs east and west and crosses the "Government" spur track, the "back track" and the main line about 200 feet north of the north side of the barber shop.

Branching off from this public highway at right angles about 100 feet east of the "Government" spur track there is an open roadway running south in front of the Lee Lumber Company's office and down in the general direction of the barber shop and ice house.

Opposite the barber shop and the ice house this roadway divides, one branch running on south to the mill and the other turning west and crossing the "Government" spur track where the accident occurred.

After crossing the "Government" spur track the roadway divides again, one branch continuing west into the alley between the barber shop and the ice house and the other running south around the south side of the ice house and then turning in a general westerly direction to the depot.

These roads are not public roads in the sense that they were laid out and designated as such by the Police Jury nor are they public streets laid out and dedicated by the village. They are not worked and kept up by either the parish or the village. But they are public roads in the sense that they are used by the public at will. They are travelled by both pedestrians and vehicles at all times of the day.

Likewise the crossing over the "Government" spur track is not a public crossing in the sense that the switch crosses a public highway or a public street.

These roads and this crossing are on the premises of the Lee Lumber Company and in its lumber yard.

Plaintiff contends that these roads are public roads and that this crossing is a public crossing and invokes against the defendant the general rule laid down by law writers and followed by the courts that it is gross negligence *per se* for the employees of a railroad company to make a "flying" switch on railway tracks running across public highways or streets through populous sections without signals or other warnings to notify travellers of the danger.

TOWNSEND v. MISSOURI-PACIFIC RY. CO.

On the other hand, the defendant contends that these roads are private roads and this crossing a private crossing, and it invokes in its favor the general rule that a railroad company is not required to give signals or keep lookouts at private crossings— ·

"* * * although the place is used repeatedly and frequently as a crossing with the mere silent acquiescence of the company, or with the knowledge and simply passive permission of the company, it would seem ordinarily at least that the traveller who uses it is at most a bare licensee, who takes his license with all its concomitant risks and perils, and as a general rule, the company owes him no duty greater than that which is due to a trespasser. In order to impose upon the company the duty to treat a place as a public crossing, those who use the place as a crossing must either have a legal right to use it, or must use it at the invitation of the company, and 'neither sufferance, nor permission, nor passive acquiescence' is equivalent to an invitation."

See, Elliott on Railroads, vol. 3, page 494.

All witnesses say that this crossing has been used by both pedestrians and vehicles for a number of years. It was planked on each side a number of years ago by the Lee Lumber Company. The defendant company "cuts" its cars there and keeps it open to traffic. The depot is on the west side of its track and all persons living on the east side of the track who haul freight either to or from the depot cross there. We do not get the impression, however, that there is a great deal of freight hauled. It is used also by people who haul lumber from the two lumber sheds on the west side of the track, and the Lee Lumber Company hauls its ice over the track.

One witness, Mr. Lindley, says that on an average five vehicles a day cross there; and another witness says that as many as twelve vehicles cross this track at that

crossing in a day; but that persons crossing the track in vehicles used for other purposes cross at the main highway north of this crossing.

There is a boarding house over on that side accommodating, one witness says, as many as eighteen laborers. These men, or some of them at least, cross at this place in going to and from the lumber sheds on the other side. It is also used by other pedestrians going to the depot, to the ice house and to the barber shop, as well as by pedestrians from that side going to the ice house to get ice.

The following testimony was given by Mr. H. T. Whatley, a witness for plaintiff, and, in substance, is about what all other witnesses said as to the character of this crossing:

"Q. Please state whether or not that accident crossing is used and has been used since you have been out at Tioga?
"A. It has been used a number of times each day.
"Q. For what purpose is it used?
"A. By trucks and wagons to haul lumber from the mill, used by vehicles of all kinds in going to the freight office to get freight and carry freight and used by trucks and vehicles, to go to the ice house to get ice.
"Q. You state that it is used a number of times each day for those purposes?
"A. Yes, sir.
"Q. Is it used at certain hours or at different hours during the day?
"A. I would say that it is used at all hours during the day.
"Q. Is it used by pedestrians?
"A. Yes, sir.
"Q. Used rarely or frequently by pedestrians?
"A. Frequently, especially during the summer months.
"Q. Why is it used during the summer months?
"A. Because it is used to get ice."

On cross-examination Mr. Whatley said the ice house and ice business belonged to the Lee Lumber Company and that ice

was delivered only up to about eight o'clock in the morning and at other times during the day when they had calls for it.

The testimony shows that the truck which was being driven by plaintiff was owned by the Lee Lumber Company and that plaintiff was employed to deliver ice and that he made his regular rounds in the morning hours to deliver ice to its customers.

On the occasion of the accident the defendant had ten cars, one box car, three flat cars and six gondola or coal cars on its track which were all connected with an engine and which it desired to place at different points on its tracks.

It carried all these cars north on the main line until the south end of the rear car, which was a box car, was north of the switch. Then by means of the "kicking back" process or a "flying" switch or "shunting" back it sent the box car back down south on the main line; the three flat cars, which came next, were sent down the mill track on the west of the barber shop and the ice house, and the other six cars, all gondola or coal cars, were sent down the "Government" spur track and over the crossing where the collision took place.

This was all done simultaneously, with one movement of the engine. There was a brakeman at each of the switches to throw the switch. One of these brakemen got on the flat cars which were sent down the mill track and followed them for the purpose of stopping them at the right place.

The brakeman who threw the switch at the place where the mill track branches off from the "Government" spur track says he sent the gondola or coal cars down the later track and after manipulating the switch walked back north, the direction from which the cars were coming, and got on the rear end of the rear car, where he was when the collision occurred.

It seems that the south end of this track runs up grade and the testimony shows that the brakeman followed these cars for the purpose of setting the brakes at the right time in order to keep the cars from rolling back.

There was no one on the lead or forward car and the brakeman on the rear end of the string of cars did not see the accident.

There was no watchman to flag the crossing.

The forward end of the lead car reached the crossing just as the defendant backed the truck up on the track.

The testimony shows that the brakeman, John Nunnally, was stationed at the public road crossing which has already been mentioned, as being about 240 feet north of the accident crossing, in order to guard that crossing. After the south end of the lead car passed that crossing he walked back and took his place on the rear end of the rear car, as before stated.

But there was no effort made to guard the crossing where the accident occurred.

There is, as usual, a conflict in the testimony as to the speed of these coal cars which struck the truck and as to whether the bell on the engine was ringing during these operations. Witnesses for plaintiff say they were sent back over the track at a speed of twelve or fifteen miles an hour, while all the train crew say that the speed was not more than five or six miles an hour. None of the witnesses for plaintiff heard the ringing of the bell while each member of the train crew testified that the engine was equipped with an automatic bell ringing device and that the bell was ringing all the while.

We are inclined to the belief that the bell was ringing, but that neither plaintiff nor any of his witnesses heard it.

It is alleged in answer but not proved that the whistle was blown.

The testimony shows also that this method of handling cars is constantly practiced at this and other place on defendant's road and is approved by the American Railway Association.

Counsel for plaintiff argue that in thus handling these cars the employees of the defendant company were negligent.

In that view we concur.

The following excerpt is from a case note volume 10, American and English Annotated Cases, page 15:

"However, making a flying or running switch, or kicking cars, is particularly dangerous under any circumstances, and the practice has been frequently condemned by the courts as a fruitful source of accidents."

(Citing authorities.)

"In fact, the practice of making flying switches or sending detached cars along a railroad track is deemed so dangerous that some railroads have made rules prohibiting the practice."

(Citing authorities.)

"It is difficult to lay down a general rule which will be applicable to every case of injury to person or property by means of a flying or running switch or the movement of detached cars; but it may be stated that it is negligence on the part of a railroad company to send detached cars across a street or highway crossing or for any other purpose by means of kicking or shunting the cars, or by detaching them on a down grade and allowing them to move by their own momentum, without giving the usual and necessary warning other than may be given by a brakeman standing on the moving cars, and with no means of control except such as may be had through an application of hand brakes."

(Citing authorities.)

In Vance vs. Ravenswood, etc., R. Co., 53 W. Va. 338, the court said:

"It is very well settled that the practice of making 'flying switches' is deemed by the courts as dangerous and is negligence on the part of the railroad companies, especially when it is done at public crossings, and without any signals having been given."

In the case of Mitchell vs. Illinois Central R. R. Co., 110 La. 630, 34 South. 714, the court, in discussing such movements by railroads, quote with approval Rhorer on Railroads, volume 1, page 491, as follows:

"It is at all times and in all places an operation attended with more or less danger."

(Citing authorities.)

To the same effect could be cited many other text writers and many other decisions of our own as well as other courts.

The roadway involved in this case is not a street or public highway in a village or a city. The crossing is not on a street or highway in a populous town or city. But, nevertheless, the crossing was used to some extent by both pedestrians and vehicles to the knowledge of the employees of the defendant company.

Elliott on Railroads, volume 3, section 1647, page 494, says:

"The duties of the company and the traveller respectively at a private crossing are somewhat different from those imposed upon each at a public crossing. As a rule the company is not required at such places to give the signals required by statute or otherwise at public crossings, but it may, in particular instances, be a question for the jury, whether in the particular case it is negligence to omit the warning signals. The fact that people repeatedly cross the tracks at a place where there is no public right of passage does not necessarily entail upon the company any duty to treat the place as a public crossing and the fact that

there are numerous trespassers and the act is committed often does not in itself relieve their presence upon the track of the character of a trespass; but situations may arise from which the company ought reasonably to forsee danger, and in such cases it has been held that the company is not absolved from ordinary care and precautions to prevent injuries."

The situation in this particular case was such that the employees of the defendant company should have foreseen danger. It was therefore their duty to use ordinary care and precaution to prevent injury to persons or property at this crossing.

Were this the only issue presented in this case we should hold for the plaintiff on the ground that the defendant was negligent; but defendant has especially pleaded contributory negligence in bar of plaintiff's right to recover. We must, therefore, determine whether plaintiff was guilty of contributory negligence and whether such negligence, if any, was the proximate cause of the injury.

On the occasion of the accident the plaintiff drove a Ford truck into the twenty-foot alley between the barber shop and the ice house in order to get ice. In doing so he crossed the "Government" spur track. After loading the ice on the truck he attempted to back out the way he had gone in. The alley is formed by the south side of the barber shop and the north side of the ice house and the north side of another small building which at that time was located just east of the ice house. The southeast corner of the barber shop is thirty feet from the west rail of the track at the crossing, and the northeast corner of the small building located east of the ice house is seventeen feet from the rail.

It is therefore but a short distance from where the truck was at the time it was loaded to the crossing.

There is a plank approach to the cross-ing which extends out six feet west of the west rail of the track.

The plaintiff backed the truck until the rear wheels rested against the west edge of this plank approach.

He says that he then stopped the truck "momentarily" and without "killing" the engine and looked up and down the track and that he neither saw nor heard the approaching cars.

He then proceeded to back the truck up on the crossing at a speed of one or two miles an hour, and he says that when the rear wheels of the truck had reached the east rail of the track the truck was struck just behind the driver's seat by the gondola cars.

He says that he neither saw nor heard the approaching car until the moment it hit the truck.

At the place where he stopped the truck "momentarily" the driver's seat occupied by him was fourteen feet and six inches west of the west edge of the track.

His testimony is, and it is corroborated by that of his witnesses, that from the place where he was sitting in the truck he could see up the track in the direction from which the cars were coming a distance of eighty-three feet, and seeing that the track was clear he attempted to negotiate the crossing by backing over it.

The driver's seat is on the left hand side of the truck, the opposite side from which the cars was approaching, and in order to guide the truck over the crossing he looked back over his left shoulder and did not again look to the right to see if cars were approaching.

The testimony shows that from the point where plaintiff was at the time he stopped to look and listen his view up the track to the north was partially obstructed by the northeast corner of the barber shop, which accounts for the fact that he could see only eighty-three feet up the track;

but by actual measurement it was shown that if he had backed his truck a little further before stopping he could have stopped it at a place where he could see approximately 250 feet up the track and at the same time his truck would have been clear of cars passing down the track; or, if while backing the truck he had looked up the track again he could have seen the cars approaching.

Railroad tracks are themselves warnings and suggestions of danger. Plaintiff says he knew this was a dangerous crossing.

When he stopped and looked he saw and realized, of course, that his view of the track was partially obstructed by this barber shop. In keeping with ordinary prudence he should not have been satisfied with his view from the point where he stopped. It was his duty to seek a view of the track from a point where he could see and hear. For a driver of a motor vehicle to merely stop, look and listen before attempting a railroad crossing does not meet the requirements of the law.

In the case of Young vs. La. Western Ry. Co., 153 La. 129, 95 South. 511, the court said:

"The duty to stop, look and listen before crossing a railroad must be performed at a time and place where stopping, looking, and listening will be effective."

Citing 168 Fed. 21; 21 L. R. A. (N. S.) 794.

Provost vs. Y. & M. V. R. R. Co., 52 La. Ann. 190, 28 South. 305.

If there was no safe place where the plaintiff could stop the truck and get a view of the track from the driver's seat it was his duty to get out and walk back. He was aware of the hazard and should have taken extra precautions.

It was so held in the case of Mankewwicz vs. Lehigh Valley R. R. Co., 214 Penn. 386 (63 Atl. 604), and in 33 Cy. 1021, we find the following:

"Ordinary precaution may also require that a driver of a vehicle should not only stop to look and listen where his view or hearing is obstructed, but that he should get out of his vehicle and approach the track and look along it in both directions for approaching trains. This precaution, however, is not required as a matter of law; but whether or not it should be taken is usually a question for the jury dependant upon the circumstances at the particular time and crossing; and ordinarily if a driver exercises due care in other respects, as in looking or listening, he is not bound to go ahead of his vehicle for that purpose, although it has been held that if by the exercise of such precaution the approaching train could have been seen, a failure to do so is contributory negligence as a matter of law."

Furthermore, it was plaintiff's duty not only to stop, look and listen once but he should have continued to keep a watch out.

Plaintiff says he looked only once, when he stopped only momentarily. When he looked he saw that his view of the entire track was obstructed by the house. That should have suggested to him that he should at least look again when he got nearer to the track; and while it is true that when he did stop he was not far from the track yet the conditions there were such as to suggest to him that he should take the utmost precautions.

He says that the truck was moving at a speed of not more than one or two miles an hour. If that be true, it could have been stopped in an instant. If he had glanced up the track a moment before the car hit him he could have stopped the truck and avoided the accident.

See: Daull vs. N. O. Ry. & L. Co., 147 La. 1012, 86 South. 477.

Also Leopold vs. T. & P. Ry. Co., 144 La. 1000, 81 South. 602.

It was, we think, the grossest kind of negligence for the plaintiff to attempt to back his truck over this crossing without seeking a view of the track from a point

where his vision would not be obstructed. He was aware of the danger and it was his duty to take extra precautions.

It is well settled in the jurisprudence of Louisiana that even though a defendant is guilty of negligence, contributory negligence on the part of the plaintiff debars recovery.

Young vs. La. Western Ry. Co., 153 La. 129, 95 South. 511.

Callery vs. Morgan's L. & T. R. R. & S. Co., 139 La. 770, 72 South. 222.

Loftin vs. R. R. Co., 135 La. 33, 64 South. 972.

Our conclusion is that whereas the defendant was guilty of some negligence in the operation of its train, yet plaintiff's gross negligence was the proximate cause of the accident and that he cannot recover.

Plaintiff points out that conductor Bernard and brakeman Burrows were out on the west side of the alley, saw the plaintiff when he was attempting to back out, knew the cars were coming down on the spur track, and that by warning plaintiff of his danger could have averted the collision, and invokes the doctrine of the last clear chance.

It is not shown that Burrows saw plaintiff at all.

Conductor Bernard saw the front end of the truck as it made a forward movement and emerged from the west end of the alley and saw it go back, but his testimony is that he thought the driver was merely maneuvering the truck so as to get it in proper position at the ice house.

"The doctrine of the last clear chance presupposes negligence on the part of the party injured, and proceeds upon the theory that notwithstanding this negligence, if the other party, being cognizant of that negligence and of the peril in which the party had placed himself, failed to take the necessary precautions to avoid injuring him, he is liable on the theory that he had a fair chance to avoid the catastrophe by the use of ordinary care, and his failure to exercise it is in such cases the proximate cause of the injury."

Wilson vs. Ill. Cent. R. R. Co., 150 Iowa 33; (129 N. W. 340, 34 L. R. A. (N. S.) 668).

The proof does not show to our satisfaction that any of the train crew were cognizant of plaintiff's peril and could have avoided the collision.

Counsel for plaintiff in brief say that the brakeman, Will Burrows,

"* * * alone of all the members of the train crew was in position to save these young men from their almost fatal mishap".

But brakeman Burrows was in charge of the flatcar which was sent down the track west of the ice house and barber shop.

Conductor Bernard says that he saw Burrows at the front end of the truck as it emerged from the alley and that Burrows was standing close by; that he stopped for a moment while the cars were rolling back on the "Government track".

Burrows was not called as a witness. Counsel for plaintiff now urge that Burrows probably saw the peril and could have averted the accident and that

"* * * his absence from the stand is an admission that his testimony would have been against defendant".

and they cite—

Day vs. Railroad Co., 35 La. Ann. 694; Rubinstein vs. Files, 146 La. 727, 84 South. 33; and

Toca vs. Rojas, 152 La. 317, 93 South. 108.

Counsel overstate the rule when they say that the absence of this witness from the stand is an admission that his testimony would have been against defendant.

The rule is, that where a litigant has an opportunity of producing a witness and fails to do so, the presumption is that the testimony of such witness would be against him.

This accident happened July 9, 1923. Burrows was then in the employ of the defendant. The cause was tried on May 6, 1924, ten months later. It is not shown or even suggested that Burrows was still in the employ of the defendant, that he was within the jurisdiction of the court, that his whereabouts were known to the defendant, or even that he was alive at the time of the trial of the case.

In the case of Sauer vs. Union Oil Co., 43 La. Ann. 699, 9 South. 566, the court held that:

"The failure of defendant to summon a witness who was an employee at the time of the accident a year preceding the trial, in absence of any proof that he remained in its employ, or was accessible, or was even living at the time of the trial, cannot sustain any presumption against defendant."

And in the case of Rayssiguier vs. Fourchy, 49 La. Ann. 1627, 22 South. 833, it was held that:

"The failure to call a witness does not justify an arbitrary presumption of suppression of testimony, or of material facts."

See, Poetz vs. Railroad Co., 42 La. Ann. 541, 7 South. 688.

If, indeed, the brakeman Burrows were alive at the time and available as a witness, plaintiff had an opportunity of calling him in order to make out his case on this point.

Godchaux vs. Maggio, 133 La. 199, 62 South. 631.

In the case of Toca vs. Rojas, 152 La. 317, 93 South. 108, supra, cited by plaintiff, the witness was summoned and counsel for the adverse party was notified that his testimony would be taken, but for some reason or other it was not taken, and the court said:

"Having the opportunity of producing these witnesses and failing to do so, the presumption is that their evidence would have been against the plaintiff."

And in the other case cited by plaintiff, Rubinstein vs. Files, 146 La. 727, 84 South. 33, the court said:

"Where the plaintiff might have summoned a witness to help make out his case, failure to do so creates the presumption that if the witness had testified testimony would have been against him."

Under the circumstances of this case we are not warranted in invoking the rule against the defendant. But even if the rule should be invoked, for it to avail plaintiff we would have to assume that Burrows was in a position to see the cars coming down the "Government track" and that he knew that plaintiff was backing the truck out over the crossing in front of them; and if we assumed that we would have further to assume that he knew that plaintiff would assume the hazard of backing over the track without observing the ordinary precaution of stopping, looking and listening at a time and place where such precautions would avail him.

If Burrows was standing near the west end of the alley, his view of the "Government track" was obstructed by the barber shop and we cannot therefore assume that he was in a position to see and appreciate the peril.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be avoided and reversed and plaintiff's demands rejected and his suit dismissed at his costs.

REYNOLDS, Judge, dissents.