The judgment appealed from is therefore affirmed.

<hr/>

(34 South. 714.)

No. 14,579.

MITCHELL v. ILLINOIS CENT. R. CO.*

(April 13, 1903.)

RAILROADS—ACCIDENT AT CROSSING—RUNNING SWITCH—CONTRIBUTORY NEGLIGENCE.

1. Under the circumstances of this case, the making of what is called a "running switch," is held gross negligence.

2. While the running switch was the remote cause of the accident, a direct and approximate cause is found in the failure of the brakeman, who was sent to a public and much used street crossing over which the running switch had to be made, to give the warning he was sent there to give.

3. The two together suffice to fix the liability of the defendant, unless contributory negligence of a character to defeat recovering supervenes.

4. While a boy of twelve years of age may be guilty of contributory negligence which bars recovery, he is not to be held to the same degree of care, prudence and circumspection that a full grown person is.

5. A case like the present one, where a railroad company is engaged in the performance of a hazardous undertaking without using proper precautions to safe-guard the public, is to be differentiated from one where a person is injured by his failure to observe necessary precautions against the ordinary and usual dangers to be anticipated at a railroad crossing.

Breaux, J., dissenting.

(Syllabus by the Court.)

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; Robert R. Reid, Judge.

Action by Augustine Mitchell, tutrix, against the Illinois Central Railroad Company. Judgment for plaintiff. Defendant appeals. Affirmed.

<hr/>

*Rehearing denied June 24, 1903.

Hunter C. Leake and Bolivar E. Kemp (J. M. Dickinson, of counsel), for appellant. Stephen D. Ellis and Benjamin Moore Miller, for appellee.

BLANCHARD, J. This case is here on appeal by defendant from a judgment against it for $3,000.00 in favor of the plaintiff, who sued in her capacity as tutrix of the minor Osmer Southworth.

Neither party asked for a jury in the court below. The trial was had before the District Judge and the cause was submitted to him, without argument, on the evidence adduced.

Osmer Southworth was a boy of between twelve and thirteen years of age when the injury which gave rise to the suit was received.

He lived in the town of Amite at the home and under the care of his tutrix, and was a youth of good training and habits and of more than ordinary intelligence.

The frankness and candor of the testimony he gave in the case—his evident desire to state only the truth, without undue coloring of his side of the controversy—make a favorable impression.

Defendant railroad runs through the town of Amite. It would, perhaps, be more correct to say the town is built up on the two sides of the railway. The principal street is called Railroad Avenue and through this extends the railway track. The avenue, including the centre space occupied by the tracks, is 300 feet wide, and in it is constructed, close to the tracks, the depot.

On either side of the space where the tracks are located runs a roadway, and these roadways are, properly speaking, the street, or two streets.

Fronting on these streets are business houses, stores, etc., facing towards the railroad, and further out on the streets, after leaving the business section, are dwelling houses.

In one of these, on the east side of the railroad, about three blocks away from the depot, lived young Southworth.

The railroad runs at that point north and south. Several streets, running east and west, cross it at right angles. The depot is situated between the two most important of these lateral streets, one north of it, the other south of it. Of the two, the latter is the more important—the street where the most of the crossing is done.

It was here that the youth was injured. The time was between eleven and twelve o'clock in the day about the middle of January, 1902.

He had been sent from home to mail some letters at the post office, which was located on the east side of the Avenue (his side), not far, we judge, from opposite the place where he was injured.

He had instructions, after mailing the letters, to visit the priest for religious instruction. The priest lived on the west side of the Avenue, and it was necessary to cross the railway tracks to reach his house.

At the point where the street crosses there are two tracks, a switch track and the main track. A few feet south of this crossing, on the east side, another switch track begins, extending southward. And there are still other switch tracks along portions of the front of the town.

Indeed what might be called "the yard" of the railway at Amite extends through the town, and it is in evidence that much switching of cars is done there every day, and always there are to be seen freight cars left standing on some of the side tracks.

At the time mentioned, the north bound local freight train had reached Amite. On one of the side tracks were two freight cars which were to be added to this train. They were located on the side track at a point south of the depot. This side track ran up to and beyond the depot, and other freight cars were on it; at the depot platform, being unloaded at the time.

This being the situation, the conductor of the train stopped it at a point south of where the southern end of the side track ran into the main track, and detaching the engine, and four or five cars with it, from the remaining cars of the train, he ran the detached section into the side track, coupled the two freight cars standing there, and which were to be added to the train, to the pilot (cowcatcher) of the engine and backed out again on the main track.

He had determined to make what is called a flying or running switch. Making running

switches, it is shown, were not unusual, though there is a rule of the company forbidding the practice.

Thus, Rule 528 of the Book of Rules intended for the governance of the employees of the Company reads:—

"A running switch must not be made when practicable to avoid it; but when made great care must be taken to prevent accident."

It is in evidence that the two cars could have been gotten out of the side track and on the main track and annexed to the train without the making of the running switch.

Thus, the engine, with or without cars attached, could have gone to the north end of the side track, backed down southward upon the cars wanted, coupled them to the rear, pulled out again northward to the main track, and there backed down to that section of the train which had been detached and left standing upon the main track south of the depot.

But the conductor explains, and gives as the reason for not resorting to the ordinary and usual method of switching, that this would have necessitated disturbing the partially unloaded cars on the same side track, which were at the depot platform; would have checked the work of unloading there going on; would have necessitated the moving of these cars; this would, likely, have caused the freight, or some of it, piled up in these cars and left insecure by being deprived of the support of that portion of the freight‚ (boxes, packages, etc.) already unloaded, to fall, causing injury to the freight, etc.

Hence, his decision to make the running switch. This was to be accomplished in this way:—the front section of the detached or divided train (consisting of the engine with four or five cars attached, and the two cars which had been pulled out of the switch at the south end and were now coupled to the front end of the engine) was sent up the main track northward to a point beyond the depot, and two hundred feet or more north of the north end of the other switch track which came into the main track just a few feet south of the cross street, or crossing, where the boy was injured. Having gotten up the track far enough for their purpose, the engine and rear cars were *backed* southward, and this *pulled* in the direction the two

cars that were coupled to the pilot of the engine. Then, after getting these cars under good headway, the coupling pin was removed, thus detaching from the engine the two cars. With accelerated speed the engine then drew away from the two cars, which followed on after it. The switch, which connected the side track, whose north end was just south of the crossing, had been opened to receive the cars and engine backing down rapidly to it, and after they had passed through it on to the side track the switch was to be closed in time to permit the two detached cars to go on down the main track to the rear section of the train standing south of the depot.

The flying switch was accomplished as described, though it appears to have been a risky proceeding. The evidence shows there was only about (say) 30 feet between the pilot of the engine and the trailing cars, just detached from it, as the engine passed into the switch.

So close was "the shave," so daring the attempt, that it attracted the attention of those standing around—even of persons upon the side walk of the street.

It also appears that it produced some excitement among the train's crew, all of whom were watching intently what was going on, and, apparently, waiting with some anxiety the result.

The crew consisted of the conductor, engineer, fireman and four brakemen.

The conductor had stationed himself on the south side of the crossing near the north end of the side track into which the switching of the engine and cars was to be made. One brakeman was at this switch and it was he that was to throw the switch at the proper time; another brakeman was stationed at the street crossing to keep people away while the switching was going on; another was on the pilot of the engine to uncouple the two cars; and the fourth was on the first of the advancing cars that were to be sent on down the main track in this running switch process. The engineer and fireman were in the cab of the engine, and it was the fireman who was then running the engine.

It is explained, though, that this was not unusual; that often a fireman will handle the engine, the engineer being present in the cab and, perhaps, directing things.

It would seem, however, that at so impor-

tant a time as the making of a risky running switch the engineer himself should have been at the lever.

Just as the backing cars and engine were passing the street crossing and going into the open switch just south of the crossing, young Southworth came down the street from the post office. He was going westward on his way to visit the priest. He was moving in a fast walk, perhaps a little trot. He reached within a few feet of the main track, on which the cars were moving, just as the last cars behind the engine, and the engine itself, were backing past. He paused watching the passing train. Within a few feet of him was the brakeman, who had been stationed there to warn people; but his face was towards the engine and moving cars; he was intently watching the performance of the flying switch; he was not facing towards the way people on that side would approach the tracks; he was giving no warning. He had a red flag, but it was in his pocket; he was not using it.

He explains he was not there to flag cars. True, but he was there to warn people, and a red flag in his hand and the waving of it would serve to give warning. And to this might have been added and should have been added the giving of attention to those who came up to the crossing, and observing them, and, if need be, telling them of the danger of attempting to cross, and warning them to look out for the two cars that were coming down following the engine. This was exactly what he was there for. But he was doing nothing of this kind. He was under the excitement incident to the attempt to make a daring flying switch.

He might just as well not have been there if he were not attending to the duties of the position.

Immediately following the passing of the engine the boy started forward to cross. He had not seen, he says, the two advancing detached cars. Nor had the brakeman there, as we have seen, looked around and given warning of them. The brakeman was not aware, even, the boy was there. Not until the boy started forward to cross did he see him.

Then he called out to him to beware; not to attempt to cross; but it was too late. The boy was on the track; the cars were upon him. The brakeman caught him and saved him from being crushed to death, but not in time to save him from serious harm. His left foot was run over by the first wheel on the east side of the first car and crushed.

There is some conflict of testimony as to whether, when the brakeman called out to the boy, if he had heeded the call and stopped, the disaster would have been averted. With District Judge, who saw and heard the witnesses, we think not. The boy was within a few feet—five or six—of the track when he started forward, and was, likely, on the track when the warning came. Had this warning been given before the boy started forward, a different case for the railroad, altogether, would be presented.

We have reached the conclusion to affirm the judgment on two grounds, (1) because the dangerous experiment of making the running switch should have been avoided—there being another and safer way—safer to the general public—of effecting the transfer of the two cars; (2) because of the gross negligence of the brakeman, stationed at the crossing, in giving his attention to the making of the running switch rather than to those who came up to the crossing, and failing utterly to give the warning he was sent there to give.

The first is remote and would not of itself suffice to fix the liability of the company; the second is direct and proximate. The two together justify the judgment appealed from.

The conductor's reasons for deciding to make the flying switch are not sufficient. With a little more pains and care and time taken, the transfer of the two cars could have been made in a way not attended with the danger incident to the method he adopted. His company had forbidden him to make running switches when practicable to avoid them. It was practicable here to avoid it.

Rorer on Railroads, vol. 1, p. 491, after giving a definition of the running switch, says:—

"It is at all times and in all places an operation attended with more or less danger."

Especially was it dangerous where attempted on the occasion under discussion. It had to be done over a prominent street crossing —the one most frequently used—in a town of many people and the resort of those living in the adjacent country, for it was the county seat of the Parish.

See Curley v. Ill. Cent. R. Co., 40 La. Ann. 810, 6 South. 103; Hamilton v. Steamship Co., 42 La. Ann. 824, 8 South. 586; Downing v. Ry. Co., 104 La. 508, 29 South. 207.

Under such circumstances the making of the running switch was gross negligence. Some authorities hold making running switches to be negligence *per se*.

See Ala. & V. R. Co. v. Summers, 68 Miss. 566, 10 South. 63; French v. R. Co., 116 Mass. 537; R. Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Brown v. R. Co., 32 N. Y. 597, 88 Am. Dec. 353; R. Co. v. Garvy, 58 Ill. 83; R. Co. v. Baches, Administratrix, 55 Ill. 379.

The Company's rule, heretofore referred to, required great care to be taken to avoid accident in those cases where resort to running switches was unavoidable, and in keeping with this requirement a brakeman was stationed at the crossing to give warning; but he failed to do so, as we have seen. This, then, was equivalent to neglect of the requirement of the rule (for the brakeman's failure was the company's), and to neglect of a plain duty which existed for the benefit of the public independent of the rule.

This failure to give the warning at the crossing, under the circumstances of this case, entails liability upon the company. The contention that the boy was guilty of such contributory negligence as relieves the Company, cannot be sustained.

It is true he could by looking to the right have seen the approaching detached cars, but not having been warned of the danger of the situation, and watching only the engine backing by, and seeing the space over the track left clear by its passage, he started across.

A boy of twelve years of age may be guilty of contributory negligence which bars his recovery. No doubt of that. But a boy of that age is not to be held to the same degree of care, prudence and circumspection which would be the case with an older person. The need for a watchman at the crossing for boys was greater than for older persons.

The case, in this respect, comes within the rule announced in Downing v. R. Co., 104 La. 508, 29 South. 207, where it was held that, the precautions to be adopted and the steps to be taken in aid of safety increase

as the danger of accident and injury are increased, and their sufficiency is to be gauged by what is called for by the circumstances of each case. In that case, too, at page 517, 104 La., 29 South. 211, the observation of the court that the mere fact of certain railroad employees having been at a given place, where they should have been, amounted to nothing unless they performed the duties for which they were placed there, applies with force to the failure of the brakeman here to give the warnings at the crossing which he was sent there to give.

In McGovern v. R. Co., 67 N. Y. 421, it was said:—

"In respect to contributory negligence on part of the boy, it is claimed that the evidence shows he did not look, before stepping upon the track, to the west, and that if he had done so he would have seen the engine, and the accident would not have happened. The rule which requires persons before crossing a railroad track to look to see whether trains are approaching, and that if they omit to do so and are injured by a collision, which if they had looked would have been avoided, are to be deemed guilty of negligence, is not to be applied inflexibly, and in all cases, without regard to age and circumstances. The law is not so unreasonable as to expect or require the same maturity of judgment, or the same degree of care and circumspection in a child of tender years as in an adult."

In Railroad Co. v. Young (Ga.) 10 S. E. 197, it was held that due care according to its age and capacity is all that can be expected of a child of tender years. While a boy of twelve is not to be regarded as "of tender years," still he is not to be held to the same accountability in the matter of contributory negligence as a full grown person is.

A case like the present one, where a railroad company is engaged in the performance of a hazardous undertaking (one forbidden by its rules) without using proper precautions to safeguard the public, is to be differentiated from one where a person is injured by his failure to observe necessary precautions against the ordinary and usual dangers to be anticipated at a railroad crossing.

See Ferguson v. Railroad Co. (Wis.) 23 N.

W. 123; Bower v. R. Co., 61 Wis. 457, 21 N. W. 536.

It would seem that where a railroad company has stationed a flagman at a public crossing, for the purpose of warning persons about to cross its tracks, the public have the right to rely (not absolutely, perhaps, but reasonably so) upon the flagman to give proper notice and warning of danger.

Thus in R. Co. v. Hutchinson, 120 Ill. 82, 11 N. E. 855, it was said:—

"This Court is not prepared to say, as a matter of law, that a person approaching a railroad crossing, when there is nothing apparent to warn him of danger, and at which he knows a flagman is stationed, whose duty it is to warn all persons of danger from moving trains, is required to look elsewhere than to the flagman. It is the duty of a flagman at a public street crossing in a populous city, which is much used by the public, to know of the approach of trains, and to give timely warning to all persons attempting to cross the railroad track, and the public have a right to rely upon a reasonable performance of that duty."

The same doctrine was announced in Clough v. R. Co. (Ill.) 25 N. E. 664, and in R. R. Co. v. Wilson (Ill.) 24 N. E. 555.

In referring to this doctrine it is not necessary for us to go any further (and we do not now do so) than to give our adhesion to it as applicable to the facts and circumstances of this case. We do not announce it as a rule general in its application in this State.

The instant case comes within the rule of the Downing Case, 104 La. 508, 29 South. 207, in another respect. There the Court rested its decision largely upon the fact that the man killed was taken by surprise by the near approach of the working train, and that the employees of the railroad company whose duty it was to keep a lookout and give warning did not do so. Here, young Southworth testifies he knew not of the approach of the detached cars, did not see them, was watching the passing engine, and considering the way open attempted the crossing—not to undertake which he had no timely warning from the brakeman stationed there for the purpose.

Judgment affirmed.

BREAUX, J., dissents.