McBride, judge.
Oliver- Frederick filed this suit against the New. Orleans Terminal Company, the New Orleans & Northeastern Railroad Company, and the Southern Railway System, claiming of them, jointly and solidarity, damages in the sum of $19,688.99,- for personal injuries and property damage, arising and growing out of a collision between plaintiff’s automobile and a loose *354 box car being “kicked” by defendants’ employees across Claiborne Avenue at the Press Street railroad yard, on the evening of December 5, 1946, between the hours of 8:00 and 8:30. The case is before us on plaintiff’s appeal from a judgment of the Civil District Court for the Parish of Orleans dismissing -his suit after a trial on the merits of the case.
The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened,, and claimed a judgment against both plaintiff and the defendants for the sum of $416.25, representing the costs of hospitalization accorded plaintiff as a result of his injuries sustained in the accident. No appeal has been taken by the intervenor.
The petition charges that the employees of the defendants were negligent in the performance of their duties, especially respecting the nature of their method and procedure in switching cars absolutely uncontrolled at a dangerous crossing in the City of New Orleans. Defendants’ answer alleges that the switching movement was conducted by the employees of defendant New Orleans Terminal Company; they deny negligence, and aver that due warning of the switching operation was given to motorists approaching the crossing, and that the accident would have been averted had plaintiff exercised due care as he approached the crossing and drove upon the tracks. In the alternative, defendants plead that there was contributory negligence on the part of plaintiff such as to bar his recovery.
Claiborne Avenue, a paved thoroughfare, crosses defendants’ railroad tracks approximately at a right angle. The automobile, which was being driven by plaintiff, was proceeding uptown, or towards Canal Street, and the box car was moving from the direction of the river toward the lake, on Press Street, or from plaintiff’s left.
Defendants maintain twenty-one tracks on Press Street at the Claiborne Avenue crossing, and the width of'the trackage area, as measured from the outer rails of the respective outside tracks, is about 265 feet. It is uncontroverted that no gates or automatic lights or signals are maintained at 'this crossing.
Plaintiff, at the time of the accident, was on the mission of conveying a sick child to the Charity Hospital. Besides plaintiff and the child, four women were riding in the automobile, one of whom was the mother of the child.
The only eyewitnesses to the accident who gave testimony in the case were plaintiff and the four major passengers in his automobile, the five members of the switching crew conducting the railroad- movement during which the accident occurred, and a flagman who was then on duty at the uptown side of the crossing.
There is a conflict in the evidence as to the weather conditions at the time of the collision. Plaintiff testified that the night was cold and misty,' and that his automobile windshield wiper was being operated. One of his witnesses says it was dark, cold, and dreary, but not raining; another says it was very cold and drizzling, while still another says it was not raining. Plaintiff’s other witness simply stated that the night was a pleasant one, not cold and not rainy. On the other hand, the testimony of defendants’ witnesses is that the weather was clear and cool, but not cold, and their testimony, in our opinion, clearly preponderates the evidence produced by plaintiff, and our belief is that there were no unusual weather conditions prevailing, such as would have interfered with , plaintiff’s observation of the tracks or of the signals given by the defendants’ flagman stationed to give warning of the approach of the unattached box car.
A “kicking” movement of a railroad car is accomplished in this fashion: the locomotive, with one or more cars attached, is put into motion in the direction in which it is desired to send the car to be kicked, and the car is then “cut off” or uncoupled and the speed of the locomotive i,s -slackened, the effect being that the car will roll ahead from acquired momentum to its intended destination. Cars may be kicked singly, or two or more together, and the car or cars to be kicked will be those farthest from the locomotive. In the operation here involved, two cars were kicked singly. *355 The locomotive, which was on whát is termed as the “lead” track, faced 'towards the river, and the two cars were coupled to the rear end or the tender of the locomotive — the end toward the lake.. The switch on this lead track, which, when thrown, would send each of the cars onto the particular track for which they were destined, was, located about 75 feet toward the river from the Claiborne Avenue intersection. The first of the two cars was kicked without incident, and was sent across Claiborne Avenue down track No. 11. The accident occurred whilst the, second car, which rolled into Claiborne Avenue at a speed estimated by defendants’ witnesses at about three or four miles an hour, was being kicked. That the car was moving slowly is also attested to by the physical fact that it came to a stop before completely crossing Claiborne Avenue, with one end toward the lake off the paved roadway and against the automobile, which had been shoved off the pavement in the direction of the lake.
Another controverted point in the case is on which of the 21 tracks the impact occurred, but the weight of the evidence demonstrates that the automobile was struck on the extreme downtown track, or the first track it reached as it came to the crossing. All five of the trainmen testified that the box car was sent down that track, and that .the accident happened thereon. The crossing flagman then on duty on the uptown side of the tracks testified that the accident occurred on a track nearer the downtown side than the uptown side of the crossing, but he is not sure as to the particular track. This witness remained at his post on the uptown side of the crossing after the accident, and did not go over to where the accident occurred.
One of the occupants of the automobile agreed with the defense witnesses that the accident happened on the first track that the automobile reached as it came to the crossing from the downtown side. ’ Two others did not know on which -track the accident happened. The fourth passenger in the automobile estimated that it was hit on the eighth or ninth track.
Plaintiff insists that he had driven across several tracks before the collision occurred, and estimated that , his automobile was hit on the ninth track, or thereabouts. He testified that he approached the crossing at about 30 miles an hour, but slowed to about 20 miles an hour as he neared the tracks, and that he was moving at about 10 miles an hour when the box car bore down on him and struck his automobile. His testimony is hazy and confused with reference to “stepping on the gas” after slowing down, and then taking his foot off the accelerator before the collision.
The salient point in this case is whether the railroad employees took ample precautionary measures to avert accidents and to safeguard the general public against the dangers attending the kicking of the cars, especially over a much used thoroughfare in a populous city, which manifestly is a highly risky and hazardous undertaking, in that the cars are uncontrolled and cannot be brought to a Stop in the event of an emergency. In Mitchell v. Illinois Cent. R. Co., 110 La. 630, 34 So. 714, 716, 98 Am. St.Rep. 472, the Supreme Court said that a “running switch,” which is somewhat similar to a kicking movement, “is at all times and in 'all places an operation attended with more or less danger.”
Frederick testified that before driving upon the tracks he did not see a flagman, and had no warning of the approach of ■the oncoming box car. The four witnesses who were riding in his car likewise denied that a flagman was on duty at the time, and they say that no warning was given of the switching movement. One witness testified that she saw the box car rolling just seconds before the impact.
According to defendants’ evidence, two flagmen were on duty, one, Ervin Oubre, being stationed at the uptown side of the tracks to warn traffic approaching from that direction, and the other, Emile Main-gelon, -was posted on the downtown side of the tracks to warn traffic travelling toward uptown, and that each of the flagmen held a lighted red lantern as a warning or danger, signal to persons -or vehicles intending to make a crossing of the tracks. *356 The foreman of the train crew testified that the kicking operation was under his superr vision, and that he followed the usual and customary procedure of calling to the flagman nearest to him — in this case Main-gelon on the downtown side of the crossing —to flag the crossing, and that Maingelon relayed the signal to flag to Oubre, on the far side, by a whistle. The foreman stated that neither movement was commenced until he saw that the flagmen were out on the crossing in their proper places, with their red lights. After starting the second movement, he testified, he boarded the rolling box car and rode it toward the crossing, and that from his position he could and did look down Claiborne Avenue and saw Maingelon holding his red lantern, and saw Maingelon’s efforts to flag Frederick’s automobile to a stop, but that the automobile came on and struck Maingelon’s lantern. The foreman then jumped from the box car, to escape the possibility of being involved in the impact with the automobile.
Oubre, who flagged on the uptown side, testified that before the second movement was started he heard .Maingelon’s whistle signal, and that he saw Maingelon on the downtown side of the tracks in- the street with his red lantern. He then turned around and faced uptown to flag traffic approaching from that direction.
The “helper,” who uncoupled- the box car on signal from the foreman, was between the tender and the box car, riding on the foot board of the tender, when the uncoupling was made. From this position he could not see Maingelon in the crossing, as the box car obstructed his view in that direction. However, he said that just before getting on the foot board he had seen Maingelon standing, in the street with his red lantern, a little downtown from the track.
The other helper’s testimony is to the ■ effect that 'he had ridden the first car kicked across Claiborne Avenue, to couple some cars about 200 feet beyond, and that he did not witness the collision. He stated that when he rodé the first car he saw Maingelon standing in the street with his lantern, on the downtown side of the tracks.
The fireman testified that he observed Maingelon with the lantern at his post during the first kicking movement, but that he did not again look out of the cab until he heard the crash. -When he alighted from the locomotive after the crash, Maingelon was in the middle of the street holding a lantern with the glass broken.
The engineer, who remained at his post on the uptown side of the locomotive during both movements, had no view of the flagging operations on the downtown side of the tracks.
Maingelon, the central figure, who is an elderly man, could not be produced as a witness in the case. He had 'retired from work some months after the accident and before the trial. When subpoenaed as a defense witness, his physician certified that he could not appear in court, because of senile dementia. Some effort was made to take -his testimony out of court, which resulted in a certification by his physician that this would be detrimental to his health.
The testimony of the defense witnesses, respecting the flagging of the crossing, appears to be frank and sincere, and we entertain no doubt that Maingelon was at the downtown side of the crossing, with his signal light, at the time of the collision. The foreman observed him unsuccessfully endeavor to flag plaintiff’s automobile to a stop, and saw the automobile hit the lantern which the flagman held. After the accident, the fireman noticed Maingelon in the street with a lantern with a broken - glass.
That there was contact between plaintiff’s automobile and the lantern is also shown by the testimony of Frederick and his witnesses. Frederick himself said that a man struck the right side of his automobile with what he described as a white light, and that the light hit his automobile at about the third track, and that the accident happened on about the ninth track. Two of the other occupants of the automobile also testified as to. a light striking the right side of the automobile. Jeffie James admitted hearing the noise of something striking the automobile, and that she saw a man’s arm, and what struck the automobile looked to her like an unlighted lantern. *357 Malvina West said that just before the collision a man came up to the right side of the automobile with a light and hit that side of the automobile with something.
Counsel for plaintiff contend that Main-gelon was not at his post of duty at the time in question, but that he appeared a split second before the impact and struck at the automobile with his lantern while it was upon the tracks, too late to successfully signal the approach of the loose box car. The weight of the evidence does not support this theory in the least.
Counsel also point to the physician’s certification that Maingelon is in a condition of senility, and argue that at the time of the collision Maingelon, because of that condition, was not possessed of the faculties necessary to perform the duties of protecting the intersection. The evidence entirely dissipates this contention. Maingel-on’s fellow workers testified as to his activities before and after the accident. Oubre, who worked at the crossing regularly with Maingelon for about six months after the accident, stated that while Main-gelon was an elderly man, his movements were active and lively. The foreman recalled seeing Maingelon working six or seven months after the accident, and one of the helpers knew Maingelon as an elderly man, but not handicapped.
In the case of Mitchel v. Illinois Cent. R. Co., supra, a young boy, who 'had been injured as a result of a running switch, was allowed a recovery against the railroad, but the court there found that the brakeman, stationed at the crossing, was negligent in giving his attention to the switching movement, rather than to those who came up to the crossing, and failed utterly to give the warning he was sent there to give.
That feature is not present in the instant case. While defendants could have used safer means and methods to switch cars, it appears to us, under the circumstances, that sufficient precautions were employed to avoid accidents and to safeguard the public, and if anyone had respected the. signals of the flagmen, which should have been seen by one attempting to traverse the tracks, no untoward incident, such as the collision involved here, could have possibly resulted. We fail to see that defendants’ employees were guilty of- the acts of negligence charged.
As has already been stated, Frederick was conveying a sick child to a hospital, and undoubtedly, in the emergency and in his haste, he was operating his automobile at too fast a rate of speed and without ordinary care. We cannot understand why he should not have observed and obeyed the flagman’s signal and braked his car to a stop before running upon Maingelon, striking the lantern which the flagman held' in his hand, and placing himself in a position of dire danger. Plaintiff’s disregard of the conditions existing at the crossing unquestionably was the sole cause of the accident.
The judgment appealed from appears to be fully supported by the record, and. it is accordingly affirmed.
Affirmed.