217 So.2d 468 (1968)
J. Errol LANEY et al.
v.
Guy P. STUBBS, Jr., and Grain Dealers Mutual Insurance Company.
No. 7520.
Court of Appeal of Louisiana, First Circuit.
December 16, 1968.
*469 John V. Parker, of Sanders, Miller, Downing & Kean, Kizer, Heaton, Craig & Cangelosi, Baton Rouge, for appellants.
David W. Robinson, of Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, for appellees.
Before LANDRY, REID, and SARTAIN, JJ.
LANDRY, Judge.
This is a tort action by Mr. and Mrs. J. Errol Laney to recover damages for the death of their teen-aged son, Thomas Newton Laney (Tommy), killed in a hunting accident averred to have resulted from the negligent firing of a .22 rifle by one James Bailey MacMurdo (Jimmy), the minor son of Walker MacMurdo, to whom subject weapon had been loaned by George Romney Stubbs (Romney), minor son of defendant Guy P. Stubbs, Jr. Also named defendant is Grain Dealers Mutual Insurance Company (Grain Dealers), Stubbs' liability insurer. Coupled with the Laney's demands is the claim of Audubon Insurance Company (Audubon), for idemnification of the sum of $9,000.00 paid the Laneys in settlement of their claim against Audubon's insured, MacMurdo.
Pending trial Mr. Laney died. Mrs. Laney has since been properly substituted plaintiff herein individually, and on behalf of her two minor daughters, issue of her marriage to decedent. From the judgment of the trial court rejecting plaintiffs' demands upon finding Tommy Laney had assumed the risk of participating in a hunting expedition under the circumstances hereinafter shown, plaintiffs have appealed. We affirm the judgment rendered below upon finding the deceased youth guilty of contributory negligence.
The tragedy which prompted this litigation occurred on the afternoon of Sunday, November 4, 1962, on which occasion four teen-aged boys, namely, Romney Stubbs, age 14, Tommy Laney, who would have reached his 15th birthday in five weeks, *470 Jimmy MacMurdo, 13 years of age, and John Pentecost (John), 14 years old, embarked upon a hunting trip for their mutual diversion. The record, consisting of an agreed statement of fact containing, inter alia, admissions by Mrs. Laney, and the depositions of defendant Stubbs, Romney Stubbs, Jimmy MacMurdo and John Pentecost, contains no dispute of essential facts, except as hereinafter otherwise indicated.
On the fatal afternoon the four lads gathered at the Stubbs residence at approximately 1:15 P.M. Romney Stubbs was armed with his own 12-gauge shotgun, Tommy Laney had brought along his 20-gauge shotgun, John Pentecost was equipped with a 410-gauge shotgun and Jimmy MacMurdo was using a .22 caliber rifle borrowed from young Stubbs. It is conceded that Romney Stubbs was experienced in the use of firearms. He had been schooled in the use of weapons since his tenth year when his father gave him the .22 rifle which Romney loaned Jimmy. In addition, Romney received firearm instruction while attending summer camp. On numerous occasions he was taken hunting by his father who supervised his activities and instructed him in the safe use of guns.
The stipulated testimony of Mrs. Laney shows that Tommy was a normal, healthy boy of at least average intelligence. Admittedly, the lad was familiar with firearms and well versed in the prudent handling thereof. He had been taught by his late father who had taken Tommy on frequent hunting, fishing and swimming trips with Tommy's friends. Mrs. Laney also stated Tommy was subject to the inflexible rule which forbid him to hunt with other boys unless accompanied by an adult. Moreover, the Laneys only permitted Tommy to participate in this particular hunt in the belief that the group would be accompanied by defendant Stubbs. On the day in question Mr. Laney personally drove Tommy to the Stubbs residence to meet the other members of the party.
John Pentecost was also experienced in handling guns. He had previously hunted with Romney but not with either Tommy or Jimmy. The degree of Jimmy's proficiency with firearms is somewhat in contention. Plaintiffs maintain he was inexperienced in the use of firearms. It appears however that on previous occasions Jimmy had hunted with Romney using the same .22 rifle. According to Romney, Jimmy was familiar with the weapon and used it carefully. It is conceded the weapon was equipped with a clip that did not function properly in that it would cause bullets to jam. Romney testified, however, that he instructed Jimmy how to manually load the gun one bullet at a time and that Jimmy operated the rifle in this manner without the slightest difficulty.
After assembling at the Stubbs residence, the boys and their guns were loaded into the Stubbs automobile and transported to the scene of the hunt, the Louisiana State University Experimental Station, otherwise known and referred to as the "quail farm." Upon being deposited at their destination, the lads were cautioned by Stubbs to "be careful." After having engaged in the hunt for approximately three to four hours, Jimmy MacMurdo came upon Tommy in a ditch leaning or lying against a pipe or culvert with a bullet wound in his head. Jimmy immediately called upon his companions for assistance. An ambulance was summoned and Tommy taken to the hospital where he died within a few hours.
Plaintiffs predicate defendant Stubbs' liability on two basic grounds: (1) Defendant is responsible for the negligence of his minor son, Romney, in loaning a dangerous weapon to a 13 year old boy inexperienced in its use, and (2) Stubbs was independently negligent in taking the boys hunting under the circumstances shown.
In essence defendants maintain there was no negligence on the part of either Stubbs, father or son. Alternatively, it is *471 contended that the deceased lad was guilty of contributory negligence in hunting with MacMurdo who was inexperienced and in the further alternative that Tommy Laney assumed the risk of hunting under circumstances known to be dangerous.
The deposition of defendant Stubbs is to the effect he knew his son to be experienced in handling firearms as defendant himself, experienced in the use of guns, had commenced Romney's instruction at about age 10. Stubbs further related that he was not aware of MacMurdo's adeptness with firearms and neither did he know Romney had loaned Jimmy the .22 rifle. According to Stubbs, the boys met at his home and requested transportation to the scene of the hunt. Stubbs drove them to the quail farm leaving them merely with the general admonition to "be careful." Admittedly, the senior Stubbs did not remain to supervise the hunt.
Romney Stubbs' deposition reveals that Jimmy, with whom Romney had previously hunted, came to the Stubbs home and requested to be included in the outing. Jimmy asked to borrow Romney's rifle which Jimmy had used before and was told by Romney that he would have to purchase his own shells as Romney had no ammunition for that particular weapon. According to Romney, Jimmy departed to purchase shells and upon returning, they were driven to the quail farm by Romney's father. Romney further stated that en route to the quail farm the procedure to be followed was discussed among the four boys. In substance Romney stated it was agreed that Jimmy, using the rifle, would hunt alone in the wooded area of the quail farm seeking squirrels, birds or whatever game he could find therein. Romney, Tommy and John, using their shotguns, were to remain in an adjoining open area known as the bean field and shoot birds of whatever nature they might find or which might be flushed from the wooded area by Jimmy's activities therein. After the hunt had progressed some three or four hours, Romney heard Jimmy screaming. Upon investigation, Romney discovered Jimmy standing over Tommy who was lying wounded in a ditch.
John Pentecost stated that en route to the hunting ground, the boys agreed that Jimmy would remain in the woods with the rifle and hunt whatever he could find there. He also stated that upon arriving, the three boys with shotguns stationed themselves a safe distance apart and took whatever cover they could find. John stated that he crouched in a ditch and shot at whatever birds flew past. According to John, Jimmy evidently had little success in the woods and returned to the bean field. It was then agreed that Jimmy would serve as "beater" to flush game for those having shotguns. Pursuant to this arrangement, Jimmy began roving about the bean field beating the brush and vegetation, yelling and firing his rifle to scare up the birds. John further stated that he had never before hunted with Jimmy but that Jimmy appeared to handle his rifle "real well." In addition, John related that after Jimmy had been roving the bean field for quite some time, he heard Jimmy yell for assistance. In answer to the summons, John went to the spot from which Jimmy called and found Jimmy standing over Tommy who lay stricken in a ditch or depression near a small culvert.
Jimmy MacMurdo's testimony is to the effect that he had hunted with Romney Stubbs before the date of the accident and was familiar with the operation of the .22 rifle. He stated that Romney had shown him how to single load the weapon as the clip did not work properly. He also stated that the gun was in good operating condition. Jimmy further stated that when the party reached the quail farm, he went immediately into the woods where he remained for about 30 minutes but then returned to the bean field because he could not find any squirrels and did not like the woods. He also related he rejoined the other members of the party and continued hunting along the edge of the woods and *472 through the bean field to flush game for his companions. Jimmy further stated that from time to time he checked with each of his associates to see what each had killed.
The nature and extent of young Mac-Murdo's activities within the bean field area where his acquaintances were stationed, a crucial issue herein, is vividly demonstrated in the following excerpts taken from his deposition:
"A. I don't remember all the times and everything, but I walked up and down a lot and I had come back and talked to them, you know, to see how many birds they had shot. I think I went and got some water which is towards the woods in a way, but runs parallel with it kind of down the road. I just mostly walked up and down that field back up in there.
Q. You were firing?
A. Sir?
Q. You were firing your weapon during this time?
A. Yes, sir.
* * * * * *
A. And then one time I had come back and talked to them again and left and came back and I was firing towards their direction because I had seen a bird of some sort.

Q. By them, who do you mean, the colored man or the boys you were hunting with?
A. The boys I was hunting with." (Deposition of James Bailey Mac-Murdo, pages 10, 11.)
"Q. Immediately before you noticed Tommy, had you been firing your weapon?

A. Yes, sir.

Q. Had you been firing it in the general direction of where he was?

A. Yes, sir.

Q. And that's why you figured you had shot him?

A. Yes, sir." (Deposition of James Bailey MacMurdo, pages 12, 13.)
"Q. Jimmy, I understand that in addition to hunting for yourself, you had another job in the hunting party.

A. You might say that in a way. It's kind of likethat's against the law maybe, too, it's like when you duck hunt, you get a boat and you scare the ducks up. You aren't supposed to do that, because it's dangerous, and it'sjust something, but that's you know, the guns would make noise and it would make the birds fly.

Q. You were then as I understand it roaming around the general area of the hunt

A. Yes, sir.
Q. firing your weapon

A. Yes, sir.
Q. to try to stir up the birds for the other boys to shoot?

A. That and hunting for myself.
Q. Now, is this what you were doing immediately before you found Tommy Laney?
A. I think that I had told him that I was going to get water, and then you see, the whole time I had been doing this, and then I happened to see some birds, and that's why I doubled back kind of like.
Q. O.K. That's all.
* * * * * *
Q. Well, Jimmy, when you doubled back and fired at these birds, where were they: were they down in the bean patch, or

A. Yes, sir.

*473 Q. and you were firing down into the bean patch to try to scare them up?

A. I fired all the way like in a complete circle. You see, I would just get them moving in a way.

Q. You were firing, in effect, down at the bean patch and into the ground?

A. Yes, sir.

Q. you weren't firing up in the trees or anything like that?

A. No, these were ground birdstypes of quail.

Q. You were firing into the ground parallel with the beans so as to scare them up?

A. Well, not at all times, but most of of the time.

Q. All right, that's all." (Deposition of James Bailey MacMurdo, pages 18 thru 20(Emphasis by the court.))
The difference between contributory negligence and assumption of risk is set forth in Prosser, The Law of Torts, 1941 Edition, Page 377, from which we approvingly cite the following:
"`Assumption of risk' is a term which has been surrounded with great confusion, because it is used by the courts in different senses, and the distinction seldom is made clear. In its primary and proper sense, it means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk. It refers to the situation in which the plaintiff, with full knowledge of the risk, voluntarily enters into some relation with the defendant involving danger to himself through the defendant's conduct. He makes the choice at his own risk, and is taken to consent that the defendant shall be relieved of responsibility. The legal position is then that the defendant is under no duty to protect the plaintiff.
It is not a question of any negligence on the part of the plaintiff who may be acting quite reasonably, and it is immaterial whether he has exercised proper caution.

* * * * * *
"To be distinguished from such assumption of risk is the defense of contributory negligence. This means that the plaintiff's own conduct has been unreasonable in view of the foreseeable risk. His behavior may not indicate in any way that he consents to relieve the defendant of any duty toward him, but he is barred from recovery by the policy of the law which refuses to allow him to shift to the defendant a loss for which his own unreasonable conduct is in part responsible. There is negligence on both sides. The plaintiff may not recover, not because the defendant owes him no duty, but because his own conduct disentitles him to maintain the action.
"It will at once be apparent that there are situations where the defenses of assumption of risk and contributory negligence will overlap. The plaintiff's conduct in accepting the risk may itself be unreasonable, because the danger is out of all proportion to the interest which he is seeking to advanceas in the case where he consents to ride with a drunken automobile driver in an unlighted car on a dark night, or dashes into a burning building to save his hat. Or, even after accepting a very reasonable risk, he may fail to exercise proper care for his own protection against that risk. In all such cases, both defenses are available to the defendant. It is this overlapping which has caused confusion, and has led some courts to speak of `assumption of risk' where no real consent to relieve the defendant of any duty can be found, but the plaintiff has proceeded to expose himself to a known unreasonable risk. Such `assumption of risk' is merely a misnamed form of contributory negligence, and is properly dealt with in that *474 connection." (Prosser p. 377, emphasis supplied.)
Assumption of risk therefore is properly applicable to those situations wherein plaintiff, with full knowledge of a peril, voluntarily enters into a relationship with defendant involving danger to plaintiff because of defendant's contemplated conduct. Such choice is made by plaintiff under circumstances implying consent to relieve defendant of liability for the proposed conduct and of the duty to protect plaintiff therefrom. On the other hand, contributory negligence envisions unreasonable conduct on plaintiff's part in the face of known or reasonably foreseeable danger. To be contributorily negligent, plaintiff's conduct need not necessarily be such as to imply consent to relieve defendant of the duty of care toward plaintiff. Nevertheless plaintiff may not recover because the law denies him reparation for a loss occasioned by his own unreasonable conduct in combination with defendant's negligence.
Counsel for plaintiffs correctly argues the general rule of law is to the effect that insofar as concerns the doctrines of assumption of risk and contributory negligence, the standard or degree of care to which a child must conform for his own protection is that of a reasonable person of like age, intelligence and experience under similar circumstances. See Restatement of the Law of Torts (Second Edition), 1965, Section 464, Page 507. For all practical purposes our own courts have followed the above general rule. See for example, Mitchell v. Illinois Cent. R. Co., 110 La. 630, 34 So. 714, wherein the Supreme Court held that although a 12 year old boy could be contributorily negligent, nevertheless he is not held to that degree of prudence and circumspection required of an adult. Our recent ruling in White v. Hanover Insurance Company, La.App., 201 So.2d 201, cited and relied upon by plaintiffs, is not apposite to the case at hand. In the quoted authority we held that as regards "small children", in that case a 10 year old boy, the defense of contributory negligence would not lie unless it be established the child acted in gross disregard of his own safety in the face of known, perceived and understood danger. Tommy Laney, lacking five weeks of attaining his fifteenth birthday, can hardly be considered a "small child". For obvious reasons, a normal 15 year old is held to a greater degree of caution and discretion than a normal ten year old.
We also find that neither Normand v. Normand, La.App., 65 So.2d 914, nor Fowler v. Monteleone, La.App., 153 So. 490, cited and relied upon by counsel for plaintiffs, are apposite to the case at bar. In the Normand case, supra, a 16 year old was absolved of contributory negligence when shot from behind by the accidental discharge of a gun carried by a following companion. In the Fowler case, supra, a deer hunter, shot when he left his stand to pick mushrooms, was not deemed contributorily negligent for having been struck by a bullet fired by an associate who shot before identifying his target.
Although not on all fours with the case before us, more nearly apposite is the decision in Briggs v. Iowa Mutual Insurance Company, La.App., 150 So.2d 905, wherein a fourteen year old boy was held guilty of contributory negligence for indulging in a joint undertaking with another youth to explode a homemade firecracker.
That young MacMurdo was guilty of actionable negligence is patent on the face of the record. It is negligence per se for a 14 year old boy possessed of average intelligence and having at least a working knowledge of a .22 rifle, to use such a weapon in the manner indicated. Not only did Jimmy know his companions were present in the field, he was also aware of their approximate locations as he went about firing more or less indiscriminately. Despite such knowledge he continued to fire at ground level and into the ground even *475 in the general direction of the spot where his friend Tommy was positioned.
In claiming Tommy Laney may not be charged with assumption of risk or contributory negligence, plaintiffs rely primarily upon two contentions. First, it is argued the record does not show Tommy was aware of and understood the danger inherent in Jimmy's hunting with a weapon having the carrying power of a .22 rifle. Secondly, it is contended the record does not establish that Tommy was aware of Jimmy's role as game flusher in the conduct of which Jimmy was to rove about the open field firing his weapon with more or less abandon to scare up game for the others to shoot.
The record establishes, as found by the trial court, that Tommy, the eldest of the group, was an experienced hunter for his age and thoroughly versed in the use of firearms. It further appears he hunted with more or less regularity and frequency. In view of these circumstances, it is reasonable and logical to assume he was fully cognizant of the carrying power of a .22 rifle. Additionally, the testimony of the other boys leaves no doubt that during the trip to the quail farm, the nature of Jimmy's weapon was the subject of discussion which led to the initial agreement that Jimmy would confine his hunting to the wooded area. Further, Jimmy's testimony shows clearly that after leaving the wooded area, he contacted his companions who then agreed to his serving as "beater." Furthermore, from time to time Jimmy checked with each of the other boys to determine how many birds each had bagged.
Although the distinction between assumption of risk and contributory negligence is admittedly thin and often obscure and difficult of determination, we find the action of young Laney, under the circumstances shown, amounts to contributory negligence rather than assumption of risk. Nothing in the record indicates intent on Tommy's part to relieve Jimmy of the effects of the latter's contemplated conduct. We can conclude only that young Laney fully understood the role Jimmy was to play in the continuation of the hunt. In view of Tommy's age and experience with weapons, we find further that he was aware of and perceived the imminent danger with which said situation was fraught. Nevertheless he voluntarily chose to continue his participation in the venture and expose himself to the peril. This decision, in view of his knowledge, understanding, training and experience, constituted unreasonable conduct on his part in the face of a known or reasonably foreseeable danger to his person. He was, therefore, in legal contemplation, guilty of contributory negligence.
The conclusions hereinabove reached eliminate the necessity of considering the alleged negligence of defendant Stubbs.
Accordingly, the judgment of the trial court is affirmed at appellants' cost.
Affirmed.