396 So.2d 455 (1981)
Larry KRAAZ and Joyce Kraaz
v.
LA QUINTA MOTOR INNS, INC.
No. 11693.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 1981.
*456 Barnett & Vedros, Ralph L. Barnett and George P. Vedros, Gretna, for plaintiffs-appellees.
Phelps, Dunbar, Marks, Claverie & Sims, Jesse R. Adams, Jr. and John C. L. Guyer, New Orleans, for defendant-appellant.
Before SAMUEL, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
Defendant, La Quinta Motor Inns, Inc. (La Quinta), appeals a district court judgment in favor of the plaintiff Mrs. Joyce Kraaz in the following sums: $3,500 for physical pain and suffering, $13,000 for future psychological and psychiatric treatment, and $30,000 for past and future mental pain and suffering; and in favor of plaintiff Larry Kraaz for physical and mental pain and suffering in the amount of $2,500. The district court order further granted judgment in favor of Mr. and Mrs. Kraaz for property loss in the amount of $23,000, including legal interest from the date of judicial demand and for all costs of the proceedings.
The record reveals that on or about December 31, 1978 the plaintiffs, who were registered guests at the La Quinta motel in Metairie, Louisiana, were robbed of approximately $23,000 in cash by two robbers who broke into their motel room during the early hours of the morning while they were asleep.
Mr. and Mrs. Kraaz both testified they heard a close catching sound which was followed by their door opening and the chain breaking away. Mr. Kraaz testified that one of the intruders jumped on him and forced his head down into the carpet with a gun, while shouting obscenities, causing a laceration to the back of his neck, and severely obstructing his ability to breathe. He testified the gunman drew back the hammer of the gun and released it, while demanding the money and threatening to kill him. The other assailant took Mrs. Kraaz into the bathroom, put her into the bathtub and gagged her. The plaintiffs were then bound hand and foot, and after the robbers ascertained the location of Mrs. Kraaz's purse and abstracted the money, they fled the room. Mr. Kraaz then got free of his ties and gave chase, but could not locate the assailants, who escaped. As a result of the incident, Mrs. Kraaz suffered a laceration of her lip and an extensive bruise on her hip.
*457 The Kraazes testified that earlier the preceding day Mr. Kraaz picked up his wife at the airport in New Orleans where she had flown for the purpose of bringing him $25,000 in cash for the possible purchase of a racehorse. They then, after stopping for a cup of coffee, proceeded to the Fair Grounds where they had lunch, watched the races, and engaged in betting. At one point during the luncheon Mrs. Kraaz extracted approximately $1,500 from the roll of $25,000 in cash (which she was carrying in a brown paper bag in her purse) in order to pay Thomas Tomillo, a horse trainer for the plaintiffs. Both Tomillo and Mr. Kraaz testified that racehorses frequently are bought and sold through cash transactions rather than by check or by means of the racetrack registry.
Several days after the robbery and assault, Mrs. Kraaz consulted Dr. Terry Passman, a psychiatrist, regarding her emotional upset and sleeplessness, who administered a tranquilizer and then sent her to East Jefferson General Hospital for stronger medication. After seeing her on a number of subsequent occasions his diagnosis was acute traumatic neurosis, evidenced by problems with sleeping (requiring the use of sleeping pills), inability to enjoy sexual relations with her husband, and fear of staying in motel or hotel rooms, in which plaintiffs had previously resided for the greater part of the year due to their travels as racehorse owners. Dr. Passman recommended at the time of trial that Mrs. Kraaz get future psychiatric treatment and estimated the length of time necessary for carrying out the therapy to be at least two years, at the rate of two or three sessions per week. He estimated costs, based on his own fees, at approximately $65 per session.
W. L. Quattlebaum, Jr., a resident of Pine Bluff, Arkansas, and also an owner of racehorses, testified that he knew both Mr. and Mrs. Kraaz and that he, himself, was a registered guest at the La Quinta in December of 1978. He described an unsuccessful attempt by someone using a ski mask to gain entrance to his room by identifying himself as the manager of the motel. Although he called the front desk, where an individual volunteered to call the police for him, no law enforcement authorities ever came to his room. Quattlebaum further stated that several days later he was called to the office of the manager, Mr. Croucher, to discuss the attempted robbery and at that time learned of the assault of the Kraazes; Croucher, however, denied having ever spoken to Quattlebaum, but said he had only heard rumors of another incident through the desk clerks.
Articles 2964 through 2971 of the Louisiana Civil Code address themselves to the responsibility of the innkeeper. We should particularly note the following provisions, applicable to the present case:
"He is responsible if any of the effects be stolen or damaged, either by his servants or agents, or by strangers going and coming in the inn." Art. 2967.
"Every landlord or keeper of a public inn or hotel, shall be required to provide with an iron chest or other safe deposit for valuable articles belonging to his guests or customers, and each landlord or hotel keeper shall keep posted upon his doors and other public places in his house of entertainment, written or printed notices to his guests and customers that they must leave their valuables with the landlord, his agent or clerk, for safe keeping, that he may make safe deposit of the same in the place provided for that purpose." Art. 2968.
"Every landlord, hotel or inn keeper who shall comply with the requirements of the preceding articles [article], shall not be liable for any money, jewelry, watches, plate, or other things made of gold or silver, or of rare and precious stones, or for other valuable articles of such description as may be contained in small compass, which may be abstracted or lost from any such public inn or hotel, if the same shall not be left with the landlord, his clerk or agent, for deposit, unless such loss shall occur through the fraud or negligence of the landlord, or some clerk or servant employed by him in such inn or hotel; provided, however, that the provisions of this article shall not *458 apply to a wearing watch, or such other articles of jewelry as are ordinarily worn about the person." Art. 2969.
"He is not responsible for what is stolen by force and arms, or with exterior breaking open of doors, or by any other extra-ordinary violence." Art. 2970.
"No landlord or innkeeper shall be liable under the provisions of the foregoing six articles to any guests or party of guests occupying the same apartments for any loss sustained by such guests or party of guests by theft or otherwise, in any sum exceeding one hundred dollars, unless by special agreement in writing with the proprietor, manager or lessee of the hotel or inn a greater liability has been has been contracted for.
"Provided that no guest shall be held bound by the limitation of value established in this Article unless this Article is conspicuously posted in the guest room." Art. 2971.
Nordmann v. National Hotel Company, 425 F.2d 1103 (Ct. of App., 5th Cir. 1970), was an action against a hotel for negligence in failure to exercise ordinary care to protect patrons from injury by third persons. The jury awarded $16,000 to the wife against whom the robber made indecent advances and $5,000 to the husband, who had been bound and assaulted with a gun. In that case the Nordmanns had attended a ball in the hotel, and later when they were reentering their room, they were accosted by the robber. It was held that the hotel was negligent in maintaining only one security guard, one room clerk and one bellboy on duty in an establishment with 1,200 rooms and a large ball in progress. That case, however, did not involve any large sum of money stolen from the plaintiffs as in the present case.
In the case of Zurich Insurance Co. v. Fairmont Roosevelt Hotel, Inc., 250 So.2d 94 (La.App. 4th Cir. 1971), this court reviewed a situation wherein a traveling salesman had had a number of fine furs stolen from his hotel room at a time when he was not present in the room, which had been locked, and there were no signs of forced entry. In that case, however, since the record established beyond a doubt that a notice stating that safety deposit boxes were provided for guests, and that the notice was conspicuously displayed in the salesman's room, the court held that the hotel was freed from the strict liability imposed by LSA-C.C. arts. 2966 and 2967, whether it had been negligent or not, and, therefore, limited the hotel's liability to $100.
In the case of Lack v. Anderson, 27 So.2d 653 (La.App. 2d Cir. 1946), the court also held that an innkeeper who had not provided a safe deposit for his guests (although there were posted in the rooms of the inn notices that there was a safe in the front office and that the inn would not be responsible for losses) had not availed himself of those laws designed to limit his liability, and therefore was responsible to plaintiff for the value of the articles stolen from his room by means of a key; however, the court noted that the theft had been perpetrated without force or violence.
In the present case this court has no difficulty in affirming that part of the trial court judgment awarding the Kraazes damages for their physical and emotional injuries suffered as a result of the assault, which we hold, as did the trial judge, was occasioned by defendant's negligence in giving out a passkey to their room. Testimony regarding the hotel's maintenance of only one security guard (who was apparently asleep at the time of the incident) and further establishing that a 17-year-old boy was left in charge of the entire hotel, during the night, at a time when it had virtually all of its rooms occupied, further supports a finding of negligence on the defendant's part. The hotel's attitude toward the safety of its guests was emphasized by the testimony of Quattlebaum, who was not given any assistance by the motel's management in connection with the attempted robbery of his own room. We agree with the district court's judgment that Nordmann v. National Hotel Company, supra, is controlling. The room was partially entered by force, which necessitates our consideration *459 of LSA-C.C. art. 2971. However, LSA-C.C. art. 2970 does not in any way exempt a hotel or motel from exercising ordinary care to protect its patrons from injury from third parties.
Neither can we find the Kraazes contributorily negligent for carrying around such sums of money as were required for Mr. Kraaz should he decide to purchase one of the horses he was considering. In the case of Laney v. Stubbs, 217 So.2d 468 (La.App. 1st Cir. 1968), the court explained that for a plaintiff to be guilty of contributory negligence his own conduct must have been unreasonable in view of the foreseeable risk. Certainly the risk of an assailant opening their motel room door with a passkey in the middle of the night, leaving them no time to defend themselves from attack or call for help, was not one which could have been foreseeable to the plaintiffs.
Regarding the cash actually stolen from the room of the Kraazes, however, this court would necessarily, due to our prior ruling in Zurich Insurance Co. v. Fairmont Roosevelt Hotel, Inc., supra, have to declare that the defendant's liability was limited to $100, if it had complied with the applicable codal articles, supra, in posting a notice requesting the deposit of valuables. The trial judge, however, was not convinced that such a notice had actually been posted in the room of the Kraazes, and we do not find manifest error in that finding of fact. The notice appeared nowhere in the photographs of the room taken by the Jefferson Parish Police Department, nor did Mr. and Mrs. Kraaz, the investigating detectives or Quattlebaum recall seeing such a notice posted in the rooms. The only testimony, in fact, that such a notice was actually posted came from the hotel's manager at the time (Croucher), whose contradictory testimony allowed the district court, as trier of fact, to disregard it in its entirety. In further following Zurich, therefore, we must hold that since it was the court's finding the defendant did not comply with the provisions of LSA-C.C. arts. 2968 and 2969, he is strictly liable to the plaintiffs under the terms of LSA-C.C. arts. 2966 and 2967 for the loss of their stolen money. Accordingly, the issue of whether the plaintiffs were contributorily negligent in carrying around such large sums of money is rendered moot.
It is questionable whether LSA-C.C. art. 2970, exempting innkeepers from what is stolen by force and arms or with exterior breaking open of doors, applies only to money or valuables stolen from the safe provided by the innkeeper or whether it also applies to valuables stolen from guests themselves. However, since the theft from the room of the Kraazes was perpetrated partially by the use of a passkey, in addition to the breaking of the chain lock, we hold that in this case LSA-C.C. art. 2970 is not controlling.
The $2,500 award of damages to Larry Kraaz for physical pain and suffering was certainly substantiated by his testimony of the physical and mental abuse suffered by him during the attack by the robbers upon his person. There is no evidence that the trial judge awarded him damages, as contended by defendant, for the mental suffering he experienced because of concern for his wife during the assault, although Mr. Kraaz did testify that, quite naturally, he also feared for her safety during their unfortunate experience.
Mrs. Kraaz's award of $3,500 for physical pain and suffering was substantiated by testimony as well as a photograph of her physical injuries.
Regarding the award of the trial court to Mrs. Kraaz of $30,000 for past and future mental pain and suffering, the record supports that this amount was well within the district court judge's discretion. Mrs. Kraaz testified that she is now afraid to stay in hotel rooms, precluding the possibility of her traveling frequently, as she once did. She stated in this regard, "I was scared. I was just scared. * * * I kept seeing this guy's face. I just wasn't comfortable." She also explained that she has difficulty sleeping at night and stated, "I just don't care about going around people." Mrs. Kraaz also said: "I've lost weight. I *460 go on sometimes weeks at a time and I just don't have an appetite, my stomachI'm just nervous inside all the time. The tranquilizers, they just don't seem to help that much."
The emotional effects of the assault and robbery on Mrs. Kraaz were also borne out by the testimony of Dr. Passman. He stated that when he first saw her on January 3, 1979, "since this had happened she was unable to sleep, not any more than two or three hours a night, that she was so upset she could not keep her mind off of it. She would mistake people just seeing them in everyday life for people they had seen in the motel lobby." He added:
"* * * I felt she was totally incapacitated. By totally I mean that I would not trust her to cross the street without getting hit by a vehicle. * * *

* * * * * *
"* * * She had a responsible husband with her who could take charge of her. If there had not been an outside partner who could accept that responsibility she would have needed hospitalization."
Dr. Passman said that he also saw Mrs. Kraaz on January 17, 1979 and on January 22, 1979, when he noted: "She was afraid to go to sleep. She felt like a recurrence of the same sort of incident was likely. She was fantasizing the same thing happening, having frightening dreams." When Dr. Passman saw Mrs. Kraaz on January 29, 1979, when she was getting ready to leave New Orleans, he noted, "She had early morning awakenings which is a very classic sign of depression. She was thinking of the incident throughout the day and continuing to have fear and a possibility of some quality of guilt." Although Dr. Passman did not see Mrs. Kraaz again until one week before the trial, he described her at that point as:
"* * * She looked more haggard. Before there was a certain freshness, in spite of the anxiety, in spite of the depression which was not present. There was a look of long term tension as if for the past year she's never relaxed. She continued to be very well groomed but with a subtle, haggard look, a person who is just never able to relax. And, the general appearance went from somebody who had an immediate problem to someone who's been living with a problem."
This court cannot find error, moreover, in the district court judge's award of $13,000 for future psychological and psychiatric treatment. Regarding the fact that Dr. Passman had not recommended extended therapy to Mrs. Kraaz right after the accident, he testified:
"Q. Did you make any recommendations as to her seeking further treatment or therapy?
"A. No, I try not to make major recommendations over a telephone.
"Q. When you last or when you saw her January 29, this was approximately a month after the incident?
"A. Yes.
"Q. Would you have expected that the problems that she suffered would be gone or that she should be over these problems?
"A. Well, if it was going to be an immediate improvement it should have been substantially better by then. There was significant improvement over that month, so I was optimistic that things would continue to improve but I felt that we might be in for much more serious problems in the long run and in the course of it all it was just too early to predict how things were going to work out."
Dr. Passman was very specific, however, regarding his recommendations to Mrs. Kraaz after meeting with her on several occasions shortly before the trial took place, and stated:
"A. And, it was at this point that I discussed with both of them her need for future treatment. And, my recommendation to her that she get this treatment, more specifically, I felt that she needed to be in therapy at least twice a week to be able to get to these problems, to deal with them. It might be more *461 often than that and I quesstimated [sic]. You never can really tell the length of time the therapy would be necessary, was at least two years.
"Q. Could it be possibly longer?
"A. It could possibly be longer. I would say at least. I would say that would be pretty much a minimum figure. And, I went through a directory of psychiatrists in Chicago and gave her several names there for referral purposes.
"Q. Doctor, what would the cost of a psychiatrist be at the rate of two or three times per week?
"A. Well, my current fee is sixty-five dollars a session. This varies somewhat from area to area. * * *"
"Mrs. Kraaz also explained in her own testimony why she had not sought further treatment during the year before the trial and why she now intended to follow Dr. Passman's recommendations:
"Q. When did you last see Dr. Passman?
"A. I saw him last Thursday, I think it was.
"Q. Did he make any recommendation to you at that time?
"A. Yes, he did. He recommended that when we get back to Chicago that I go see a psychiatrist up there and he gave me quite a few names to choose from, for some of the best ones up there that I should go see.
"Q. Is it your intention to follow his recommendation?
"A. Yes, because my husband thought that if I just wouldn't talk about this and that it would all go away but it hasn't and every time I talk about it or start thinking about it, it's all just like it was yesterday. It's the same thing over again. So, I got to go see someone. Someone's got to help me."
In considering the damages awarded to the Kraazes this court finds that they were just, reasonable, and well within the discretion of the district court judge; therefore, we can find no basis to disturb them on review. Reck v. Stevens, 373 So.2d 498 (La.1979).
For the reasons assigned, the judgment of the trial court is affirmed.
AFFIRMED.
SAMUEL, J., concurs with written reasons.
SAMUEL, Judge, concurring.
I have serious doubts regarding: (a) whether or not the notice limiting liability was posted as required;[1] (b) the amount of money actually lost in the robbery; and (c) the amounts of the awards for mental and physical injuries allegedly sustained by the plaintiffs (which I believe are excessive). However, under the guidelines established by the Supreme Court relative to our Constitutional fact-finding authority, I cannot say the majority is incorrect.
Accordingly, I respectfully concur.
NOTES
[1] It should be noted that the investigating deputies were not interested in determining or observing whether or not there was a notice posted, and in the photographs of the room the door was open and the inside of the door, on which the manager testified the notice was posted, is not shown.