Mathilda **DURANDY**

v.

**FAIRMONT ROOSEVELT HOTEL, INC.**

Civ. A. No. 77–480.

United States District Court,
E. D. Louisiana,
Section "I" Division.

Oct. 22, 1981.

Fairmont Roosevelt Hotel, Inc. (hereinafter referred to as the "Fairmont") for damages sustained from a jewelry loss. Mme. Durandy, while a paying guest at the Fairmont, suffered this loss on the morning of May 22, 1976.

The trial having been bifurcated, at the November 30, 1978 trial date, counsel addressed the liability issue. On Thursday, October 2, 1980, the Court, again sitting without a jury, heard the remaining evidence on liability and ordered any additional briefs filed by October 20, 1980, at which time the matter was taken under submission.[1]

In *Laubie v. Sonesta International Hotel Corp., et al*, 626 F.2d 1324 (5th Cir. 1980), the Court of Appeals for the Fifth Circuit certified questions to the Louisiana Supreme Court regarding the parameters of Louisiana Civil Code Articles 2971 and 2969. Upon this Court's opinion that such interpretation could be pertinent to the resolution of the instant case, it stayed the case by minute entry dated April 16, 1981. The Louisiana Supreme Court, having considered the legislative intent of the codal articles, rendered its opinion on May 18, 1981.

W. Robert Morgan, New Orleans, La., W. C. Douglas Friederichsen, Gretna, La., for plaintiff.

Rene A. Curry, Jr., New Orleans, La., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

The plaintiff, Mathilda Durandy, filed this action on February 10, 1977 against the

### FINDINGS OF FACT

1.

Mme. Durandy, a resident and domiciliary of Paris, France, registered at the New Orleans, Louisiana Fairmont Hotel on May 19, 1976 whereupon she received assignments to room no. 436 and to safe deposit box no. 8. The plaintiff identified a copy of the "Safety Deposit Vault" card,[2] her signature on the reverse of the card indicating her usage of the deposit facility. The card reflects that she used the box four times on

---

1. The plaintiff sought to introduce into evidence certain documents as Depositions Upon Written Questions. These represent the testimony of Mme. Michel Colin, Mr. Roger L. Mazin, Mr. Aristide N. Espezel, and Mr. Jacques Nouel. The plaintiff, however, failed to comply with the directives of the Federal Rules of Civil Procedure regulating Depositions Upon Writ-

ten Questions. With such transgressions of Rules 31(b), 30(b)(4), (c), (e), and (f), the Court must find that these documents are inadmissible as evidence. *Lipscomb v. Groves*, 187 F.2d 40 (3d Cir. 1951.)

2. Plaintiff's exhibit No. 6.

May 19, 1976, not once on May 20, 1976, twice on May 21, 1976, and not at all on May 22, 1976. At the November 30, 1978 trial, however, Mme. Durandy testified that she used the box three times on May 19, 1976 (upon her initial arrival, before departing for her evening engagement, and upon returning later that evening), twice on May 20, 1976 (prior to and after attending a luncheon), and three times on May 21, 1976 (prior to lunch, upon her 5:00 p.m. return to the hotel, and before the evening activities). Access to the deposit box on the morning of May 22, 1976 being a pivotal factual issue of this lawsuit, Mme. Durandy also testified that she used the box on the May 22, 1976 afternoon after the burglary.

### 2.

The pieces of jewelry subject of this lawsuit—to which Mme. Durandy attested her ownership—include a 16½ carat diamond solitaire ring, a platinum guard ring containing sapphires, and two flower-shaped diamond and ruby clips. Evidentiary photographs depict the diamond and ruby clips.[3] Excepting the sapphire ring which she purchased in 1963 from Mr. Aristide Espezel in Paris for 8,000 francs, Mme. Durandy's mother, five years before her death, had given the jewelry to the plaintiff. Thus, the jewelry was not transmitted through a succession proceeding, Mme. Durandy and her brother having agreed to the distribution. Mme. Durandy carried no insurance on the jewelry. No appraisal had been conducted.

### 3.

The following facts narrate the plaintiff's activities on the May 21, 1976 evening. Mme. Durandy retrieved her evening jewelry from the safe deposit box at approximately 7:00 p.m. This included the above-described pieces in addition to a ruby solitaire ring, diamond earrings, and a pearl necklace.

Mme. Durandy, escorted by Mr. Pierre Sciclounoff, attended the social events surrounding the Bal des Petits Lits Blancs,

highlighted by an 8:00 p.m. cocktail party and a dinner-dance lasting until 2:00 a.m. The couple then attempted admittance into the overly-crowded Regine's nightclub and entered a bar before returning to the nightclub. Upon leaving Regine's, the couple proceeded to the French Quarter Cafe du Monde. From there, Mme. Durandy and Mr. Sciclounoff returned to the Fairmont via bus at approximately 5:30 a.m.

Mme. Durandy testified that upon entering the hotel, she proceeded to the front desk intending to deposit her jewelry.[4] Estimating a 15–20 minute waiting period during which the plaintiff looked around the lobby for a hotel employee, she stated that she saw neither a bell nor a black house phone on the counter. When questioned as to whether she walked to the opposite end of the lobby to seek help at the hotel's all-night restaurant, the plaintiff replied that she was unaware of such an operating restaurant. With no Fairmont employee available for assistance, Mme. Durandy was unable to deposit her jewelry in the safety box.

At approximately 5:55 a.m., Mme. Durandy and Mr. Sciclounoff left the lobby and retired to the plaintiff's room where she locked the door and secured the night chain. While in the bathroom, the plaintiff removed her earrings and pearl necklace, placing them in a cosmetic case. Mme. Durandy then placed the clips, the diamond solitaire ring, and the sapphire guard ring in a bureau drawer in the bedroom. As swelling prevented her from removing the ruby ring, it remained on her finger.

Trial testimony presented the following sequence of events: the couple fell asleep at approximately 6:45 a.m., having set the alarm clock to awaken at 9:00 a.m. Mme. Durandy heard shouting in the hallway prior to awaking to the alarm. When Mr. Sciclounoff arose and began dressing, he discovered that his Cartier watch was missing, which he had placed atop the television set. The plaintiff then realized that the

---

3. Plaintiff's exhibits Nos. 1, 2, 4, 5.

4. The front desk was compartmentalized with the following services side-by-side: Mail and Information/Registration/3 Cashier windows.

items placed in the drawer, the two clips and two rings, were also gone. The jewelry stored in the cosmetic case located in the bathroom, however, had not been removed. Since the telephone wires had been pulled out from the wall, Mme. Durandy was unable to summon help by telephone. She thus proceeded immediately to the front desk to report the loss. The door to her hotel room was closed, yet had been unlocked and the night chain had been severed. Thereafter, Mme. Durandy was questioned by hotel security personnel and agents of the New Orleans Police Department and the Federal Bureau of Investigation.

#### 4.

Mr. Sciclounoff, a Swiss attorney, stated the length of his acquaintance with Mme. Durandy as ten to eleven years.[5] In confirming the May 21, 1976 evening activities, Mr. Sciclounoff testified that upon their return to the hotel, he waited with the plaintiff at the hotel desk, confirming that no hotel personnel were present in the lobby or behind the front desk. Additionally, he attested to the absence of a desk bell. Mr. Sciclounoff verified Mr. Jack Nisberg's presence at the front desk upon Mr. Sciclounoff's approximate 5:30 a.m. arrival. After Mr. Nisberg left the lobby with Mme. Sarrat at approximately 5:45 a.m., Mr. Sciclounoff and Mme. Durandy waited alone until retiring to the plaintiff's room.

Mr. Sciclounoff related his May 22, 1976 daytime activities as they pertain to the instant case. His description of Mme. Durandy following the jewelry loss discovery indicates her hysterical reaction. Mr. Sciclounoff departed the plaintiff's room prior to her notification of hotel personnel. When he returned to her room, having changed from his evening clothes, he assumed that the men he heard speaking therein were investigating the burglary. He then proceeded to his luncheon engagement at Antoine's. Mme. Durandy failed to join Mr. Sciclounoff for this midday event. When Mr. Sciclounoff returned to the Fairmont later in the afternoon he complied with an FBI agent's request to discuss the burglary.

#### 5.

Mme. Francine Sarrat, who has enjoyed a 15-year friendship with Mme. Durandy, accompanied the plaintiff to the New Orleans festivities surrounding the Bal des Petits Lits Blancs. Well-familiarized with the plaintiff's jewelry, she testified regarding Mme. Durandy's frequent use of these pieces. Mme. Sarrat identified the photograph of the plaintiff taken by Mr. Nisberg the evening of the ball,[6] adding her description of the clothing the plaintiff wore for the occasion.

Upon Mme. Sarrat's 5:00 a.m. return to the Fairmont on May 22, 1976, she went directly to the safe deposit box area intending to deposit her jewelry. After waiting five minutes, during which she tapped on the desks fronting the concierge station and the deposit box station, an employee appeared who did not have the key and thus could not assist her. The situation having angered Mme. Sarrat, she proceeded to her room to prepare for her departure. At 5:30 a.m. she returned to the front desk. It was at this time when Mme. Sarrat observed Mme. Durandy and Mr. Sciclounoff waiting to gain access to the safe deposit box. After waiting ten additional minutes without avail, Mme. Sarrat was escorted to her room by Mr. Nisberg. Unable to utilize the deposit facilities, Mme. Sarrat slept with her jewels under her mattress.

#### 6.

Mr. Jack Nisberg, a professional photographer employed by the French *Vogue* publication, accompanied the group attending the Bal as the magazine's representative. Having known Mme. Durandy for six or seven years in both professional and social capacities, Mr. Nisberg testified regarding

5. Mr. Sciclounoff's status as a resident of Geneva, Switzerland, was established by the July/August, 1978 edition of *Architectural Digest* introduced into evidence as plaintiff's exhibit No. 7 which portrayed his place of residence.

6. Plaintiff's exhibit No. 1.

his familiarity with the plaintiff's jewelry. She had been a subject of his photographs in France (in Paris and in Deauville) and in New Orleans, Mr. Nisberg identifying the two photographs taken of the plaintiff during the Bal des Petits Lits Blancs festivities. The photographer testified that he saw Mme. Durandy four or five times during the evening of the Bal, recognizing the pieces of jewelry adorning her person. He described her flower-shaped clips as "famous."

In relating his pertinent activities on the May 21, 1976 evening, Mr. Nisberg stated that he departed Cafe du Monde just after 5:00 a.m. and arrived at the Fairmont at approximately 5:15 a.m. He proceeded to the front desk to obtain a room key and found no employees nor a bell. He called for an employee to no avail. Mr. Nisberg testified that he waited until 5:40 a.m. whereupon he climbed over the desk to retrieve his room key. During this waiting period, Mr. Nisberg encountered and spoke to several acquaintances in the lobby, including Mme. Durandy and Mr. Sciclounoff. Upon Mme. Sarrat's reentry into the lobby, she informed Mr. Nisberg that she had experienced the same problem in obtaining hotel service.

### 7.

Anthony Rochon testified at the defendant's behest. Employed as the only all-night Fairmont bellman, his 11:00 p.m.—7:00 a.m. shift overlapped the period during which the jewel theft occurred. The bell station was located across from the front desk in the lobby. Excepting instances when his guest assistance duties would take him to the hotel guest rooms, Mr. Rochon testified that he would normally remain at the bellman desk. Mr. Rochon testified that if one or more employees would leave the front desk, one employee would always remain there during the 11:00 p.m.—7:00 a.m. shift. The house phones were located in the nearby lounge, visible from the lobby, with an operator on duty 24 hours a day, according to Mr. Rochon. He further stated that in May, 1976, he never noticed the presence of bells in the lobby.

On cross-examination, Mr. Rochon had no recollection of possibly eating at Bailey's on May 22, 1976, as was an occasional practice. Mr. Rochon responded that he did not know whether or not he would aid a guest having trouble depositing jewelry in the safety box, stating that he would inform the cashier in such a situation.

### 8.

On May 22, 1976, Henry J. Benigno worked the night shift in his assistant manager capacity at the Fairmont. In his duty performance—which entailed handling guest complaints, reservations, VIP lists, and financial posting—Mr. Benigno stated that he was positioned at the front desk in the lobby, manning the mail and registration stations. He confirmed a telephone operator's and a bellman's 24-hour duty.

Mr. Benigno testified that it was not a frequent occasion when all employees were simultaneously away from the front desk. Upon completing the financial work and the VIP list, however, Mr. Benigno was compelled to leave his post to photostat and distribute these compilations. Such procedure would require an approximate 10–20 minute absence from the desk, Mr. Benigno performing the aforesaid functions on the mezzanine level. He recalled the VIP list during the period in question as being particularly lengthy. With fewer employees manning the desk at night, Mr. Benigno stated that he usually assumed extra duties.

Mr. Benigno recalled that bells were positioned on the front desk; however, he had no memory of whether the bells were there in May, 1976. A chimes system replaced the bells during a managerial transition, yet Mr. Benigno was unable to recall whether the system had been installed by May, 1976.

Regarding the procedures employed for usage of the safe deposit boxes, Mr. Benigno testified at trial that he, the auditors, or the cashiers could assist in gaining access to the vault. His deposition testimony, however, revealed that procuring the guests' keys for the deposit boxes was handled strictly by the cashiers. His role was thus qualified by his explanation that he had

been known to help. The process of utilizing the deposit boxes required that a guest initially complete a card with the necessary information and thereafter sign the back of the card at each usage. Mr. Benigno's unfamiliarity with the procedures resulted in his ignorance as to whether the hotel employee initialed the card after the guest's signature.

Mr. Benigno remembered several days of the period of the French dignitaries' Fairmont stay in the same general manner in which he recalled the stay of many VIPs. He could not, however, distinguish any one night from the other of this interval.

### 9.

Yvonne Davis, the head night auditor, had been employed at the Fairmont since 1942. During the 11:00 p. m.—7:00 a. m. shift, she regularly performed her duties behind the front desk in the cashier's section without facing the lobby. Ms. Davis verified the telephone operator's 24-hour duty as well as the housekeeping staff's and a bellman's night-time presence in the lobby. Additionally, she stated that bells were placed on the counter for service and that three phones could be found at the end of the counter.

Although on duty on May 22, 1976, Ms. Davis' job did not entail guest assistance in usage of the safe deposit boxes. This was the cashier's function. She would, however, have aided in this duty had no one been present. At trial, Ms. Davis stated that she later—after the incident in question—was authorized to assist guests in gaining access to the deposit boxes.

Ms. Davis' testimony revealed that she would only leave her desk to wrap her sandwich or to go to the one-person restroom. Regarding the Bal festivities, Ms. Davis remembered nothing distinguishing about such occasion from any others. Neither did Ms. Davis possess any independent recollection of May 22, 1976.

### 10.

Mary Funchess, the Fairmont cashier working the night-duty shift of May 21–22, 1976, testified regarding the hotel's full oc-cupancy rate during the time in question and the attendant increase in responsibilities. According to Ms. Funchess, neither taking meals nor performing duties required her to leave the front desk. Her testimony further revealed that a bell was positioned on the desk in May, 1976. Testifying at the October 2, 1980 trial, Ms. Funchess stated that the bell had been removed for approximately a year before the October, 1980 trial date and replaced with nothing. Additionally, she attested to the night bellman's presence as well as the availability of house phones at the end of the counter and the 24-hour operator service.

As a night auditor and cashier, Ms. Funchess' duties included gaining access to the safe deposit boxes. Regarding the deposit facility usage, Ms. Funchess testified that she never had refused assistance to a guest. Her deposition testimony revealed, however, that she had no specific independent recollection of May 22, 1976.

### 11.

Vincent Lore, the Fairmont security director, testified regarding his duties during the time in question. With the two security house officers under his supervision during the night shift, Mr. Lore maintained a lobby patrol. He testified that shortly after 9:00 a. m. on May 22, 1976, he received a call from the hotel operator informing him of a theft. Thereafter, he proceeded to Mme. Durandy's room to conduct an interview and an investigation. Although Mr. Lore experienced difficulty with the language barrier—interpretation services being provided by Fairmont general manager Klaus Kelterborn—he attested to the night chain having been cut to gain entry to room 436. Two members of the New Orleans Police Department were also summoned for investigatory purposes. Mr. Lore specified that the burglary occurred between 6:00 a. m.—9:00 a. m.

## CONCLUSIONS OF LAW

### I.

Jurisdiction herein is based on diversity of citizenship. Plaintiff Mme. Durandy, a

French citizen, and the defendant Fairmont Hotel, an American corporation, are involved in the instant controversy exceeding the $10,000 jurisdictional amount. 28 U.S.C. § 1332.

## II.

[1] A federal court exercising diversity jurisdiction is " 'in effect, sitting as a state court.' " *Cole v. Elliott Equipment Corporation*, 653 F.2d 1031 (5th Cir. 1981), quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). This Court is thus bound to apply the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, the following provisions of the Louisiana Civil Code govern the instant adjudication:

Art. 2965. An innkeeper is responsible as depositary for the effects brought by travelers who lodge at his house; the deposit of such effects is considered as a necessary deposit.

Art. 2966. An innkeeper is responsible for the effects brought by travelers, even though they were not delivered into his personal care, provided however, they were delivered to a servant or person in his employment.

Art. 2967. He is responsible if any of the effects be stolen or damaged, either by his servants or agents, or by strangers going and coming in the inn.

Art. 2968. Every landlord or keeper of a public inn or hotel, shall be required to provide with an iron chest or other safe deposit for valuable articles belonging to his guests or customers, and each landlord or hotel keeper shall keep posted upon his doors and other public places in his house of entertainment, written or printed notices to his guests and customers that they must leave their valuables with the landlord, his agent or clerk, for safe keeping, that he may make safe deposit of the same in the place provided for that purpose.

Art. 2969. Every landlord, hotel or innkeeper who shall comply with the requirements of the preceding articles [arti-cle], shall not be liable for any money, jewelry, watches, plate, or other things made of gold or silver, or of rare and precious stones, or for other valuable articles of such description as may be contained in small compass, which may be abstracted or lost from any such public inn or hotel, if the same shall not be left with the landlord, his clerk or agent, for deposit, unless such loss shall occur through the fraud or negligence of the landlord, or some clerk or servant employed by him in such inn or hotel; provided, however, that the provisions of this article shall not apply to a wearing watch, or such other articles of jewelry as are ordinarily worn about the person.

Art. 2970. He is not responsible for what is stolen by force and arms, or with exterior breaking open of doors, or by any other extraordinary violence.

Art. 2971. No landlord or innkeeper shall be liable under the provisions of the foregoing six articles to any guests or party of guests occupying the same apartments for any loss sustained by such guests or party of guests by theft or otherwise, in any sum exceeding one hundred dollars, unless by special agreement in writing with the proprietor, manager or lessee of the hotel or inn a greater liability has been contracted for.

Provided that no guest shall be held bound by the limitation of value established in this Article unless this Article is conspicuously posted in the guest room. (As amended by Acts 1912, No. 231)

## III.

Articles 2968, 2969 and 2971 provide for an innkeeper's limitation of liability upon his compliance with the codal strictures. The innkeeper must provide his guests with "an iron chest or other safe deposit for valuable articles" and "keep posted upon his doors ... written or printed notices" informing the guests of the necessity to utilize such depository system. *Robbins v. Pontchartrain Apartments, Inc.*, 175 La. 278, 143 So.2d 263 (1932); *Weiss v. Succession of Monteleone*, 1922, Orleans No. 8182

(Peltiers Orleans Appeals 277). The codal articles thus form an integrated schema regulating the innkeeper's liability, as illustrated by *Lack v. Anderson*, 27 So.2d 653 (La.App., 2d Cir. 1946). The innkeeper in *Lack* who provided no iron chest nor safe deposit measure while posting notices advising guests of the availability of a safe, was held liable for damages resulting from a robbery. The Fairmont, having provided its guests with a safe deposit procedure and accordingly informing its guests of such safety system through notices posted in the rooms,[7] sought to limit its liability to the $100 maximum mandated by Article 2971.[8]

### IV.

The Supreme Court of Louisiana, in *Laubie v. Sonesta International Hotel Corp., et al.*, 398 So.2d 1374 (La.1981), interpreted the parameters of Louisiana Civil Code Articles 2971 and 2969. The questions certified to the Louisiana Supreme Court were presented in the following language:

1. If the negligence of an officer or employee of an innkeeper results in a loss to the property of the innkeeper's guests by theft while the guests are resident in the inn, is the liability of the negligent person limited to $100 by Article 2971, Louisiana Civil Code?

2. More particularly, the Louisiana intermediate courts have held that Article 2971 of the Civil Code, as reenacted by Act 231 of 1912, provides a limitation not only for the innkeeper's strict liability as a depositary but also to his liability for loss occasioned through the theft or negligence of his employees. *Zurich Insurance Co. v. Fairmont Roosevelt Hotel, Inc.*, 250 So.2d 94 (La.App. 4th Cir. 1971); *Pfennig v. Roosevelt Hotel*, 31 So.2d 31 (La.App. Orl.1947). If indeed this is so, *but see* Note, Innkeepers—Limitation of Liability for Loss of Guests' Property, 22 Tul.L. Rev. 333 (1947), was the statutory intent of the 1912 amendment of Article 2971, in the light of the statutory scheme of Articles 2965–2971 with regard to an innkeeper's liability, also to limit the liability of the innkeeper's employees for loss occasioned through their own "fraud or negligence," Article 2969? *Laubie v. Sonesta International Hotel Corp., et al*, 626 F.2d 1324 (5th Cir. 1980).[9]

The Louisiana Supreme Court responded to the above-stated questions in the negative.[10] Having examined the Civil Code

---

7. Counsel stipulated that the following notice was displayed in plaintiff's room at the Fairmont in a conspicuous place on the door. It was introduced into evidence as defendant's exhibit No. 1.

NOTICE TO OUR GUESTS

"In accordance with Article 2968 of the Revised Civil Code of Louisiana, we have provided safety deposit boxes for valuable articles belonging to our guests, and our guests are hereby notified that they must leave their valuables with us so that we may make safe deposit of said valuables in a place provided for the purpose.

"Revised Civil Code 2971. Limitation on Liability of Innkeeper-Notice.—No landlord/innkeeper shall be liable under the provisions of the foregoing six articles to any guest or party of guests, occupying the same apartments for any loss sustained by such guests or party of guests by theft or otherwise, in any sum exceeding One Hundred Dollars, unless by special agreement in writing with the proprietor, manager or lessee of the hotel or inn a greater liability has been contracted for. "Provided that no guest shall be held or bound by the limitation of value established in this article unless this article is conspicu-

ously posted in the guest room. (As amended by Acts 1912 no. 231)."

8. Introduced into evidence as defendant's exhibit No. 2, Mr. Ronald Ronzello's April 5, 1977, communication to plaintiff's counsel represents the Fairmont's position. This communication transmitted the $100 that the Fairmont contended was its maximum liability under Louisiana Civil Code Articles 2965–2971.

9. In *Laubie v. Sonesta International Hotel Corp., et al*, 650 F.2d 680 (5th Cir. 1981), the Fifth Circuit attached the opinion of the Louisiana Supreme Court to its per curiam opinion reversing and remanding the *Laubie* case to the district court.

10. The Court must take cognizance of the dissenting opinion of Justice Marcus in *Laubie* in which he notes that the certified questions raised the issue of whether the Article 2971 $100 liability limitation on innkeepers was equally applicable to officers and employees of innkeepers. Justice Marcus stated:

In answering this question in the negative, the majority concluded that the limitation

and the pertinent doctrinal materials, the court concluded that the legislative aim of Article 2971 sought only to limit the innkeeper's contractual liability. In distinguishing the principles of deposit from principles of delictual responsibility, the Louisiana court concluded that the amended Article 2971 "does not apply to an innkeeper's liability in tort but limits only his contractual responsibility as depositary for loss or damage of the property of a guest or occupant." *Laubie v. Sonesta International Hotel Corp., et al,* 398 So.2d at 1378. Such holding mandated future disregard of contrary Louisiana judicial language, citing *Pfennig v. Roosevelt Hotel, supra; Zurich Insurance Co. v. Fairmont Roosevelt Hotel, Inc., supra.*[11]

## V.

The Louisiana Supreme Court's decision in *Laubie* cannot support the Fairmont's contentions regarding its $100 maximum liability. Adherence to the Louisiana court's interpretation demands examination into any possible negligence of the Fairmont before exonerating the hotel from additional liability.

■ While the Fairmont employees' testimony revealed their customary practice of remaining at the front desk position in performing their duties and in offering guest assistance, none of the hotel employees had a specific independent recollection of May 22, 1976. In light of the testimony of Mme. Durandy, Mr. Sciclounoff, and Mme. Sarrat, all of whom waited at the front desk during the controverted time, the Court cannot find that the Fairmont employees were so positioned. The testimony of Mr. Nisberg further corroborated the attested-to circumstances surrounding the May 22, 1976 morning wherein these guests could not locate a hotel employee for service. Indeed, Mr. Nisberg's action in jumping over the coun-

ter to obtain his room key illustrates his inability to obtain help through more standard procedures. The safe deposit card evidences Mme. Durandy's usage and familiarization with the Fairmont deposit procedures. The Court must conclude that had a Fairmont employee been present for guest assistance, Mme. Durandy, in accordance with her prior practice, would have deposited her jewels in the safe deposit box.

Furthermore, Mme. Durandy's room was entered by using a key to unlock the door before the night chain was severed. However this key was obtained, the very fact that it was available for someone's use indicates additional negligence on the part of the Fairmont. Certainly a period during which a hotel has a full occupancy rate with a number of French dignitaries as guests would necessitate security measures and precautions to guard against precisely the type of incident subject of this lawsuit.

Indeed, in view of a guest's rights of privacy and peaceful possession, the Fairmont had an affirmative duty not to allow unregistered and unauthorized third parties to gain access to the rooms of its guest. *Campbell v. Womack,* 345 So.2d 96 (1st Cir. 1977). "The law imposes upon innkeepers *at least* ordinary or reasonable care to protect their guests against injury by third persons." *Nordmann v. National Hotel Company,* 425 F.2d 1103 (5th Cir. 1970) (emphasis in the original.)

## VI.

■ The defendant would suggest that Article 2970 eliminates any responsibility imputed to the hotel due to entry partially having been gained to Mme. Durandy's room by forcible means. In *Kraaz v. La-Quinta Motor Inns, Inc.,* 396 So.2d 455 (4th Cir. 1981), the plaintiff hotel guests were victims of a robbery occurring when two men broke into their hotel room during the

does not even apply to the innkeeper himself in the case of tort liability; thus, it did not specifically address the question of whether the limitation applies to officers and employees of the innkeeper. 398 So.2d at 1378.

11. The above-cited cases, as adjudications of the codal schema applicable in the instant case, represent impositions of the $100 maximum liability on the innkeepers who had complied with the codal requirements—regardless of any possible negligence on the part of the hotel.

early morning hours while they slept. The Louisiana Fourth Circuit Court of Appeal affirmed the trial judge's finding that the defendant hotel was negligent in giving out a passkey to the plaintiffs' room, maintaining only one security guard (who apparently was asleep at the time of the incident), and positioning a 17-year-old boy entirely in charge of the fully-occupied hotel. The room having been partially entered by force—the door opened with the passkey and the night chain cut—the court stated that Article 2970 "does not in any way exempt a hotel or motel from exercising ordinary care to protect its patrons from third parties." The court thus posited and responded to the question posed by the interpretation of Article 2970:

> It is questionable whether LSA–C.C. art. 2970, exempting innkeepers from what is stolen by force and arms or with exterior breaking open of doors, applies only to money or valuables stolen from the safe provided by the innkeeper or whether it also applies to valuables stolen from guests themselves. However, since the theft from the room of the Kraazes was perpetrated partially by the use of a passkey, in *addition* to the breaking of a chain lock, we hold that in this case LSA–C.C. art. 2970 is not controlling. 396 So.2d at 459. (emphasis in the original).

This Court follows the rationale enunciated in *Kraaz v. LaQuinta Motor Inns, Inc.,* supra, noting that in *Robbins v. Pontchartrain Apartments, Inc.,* supra, the Louisiana Supreme Court applied Article 2970 to a situation wherein the robbery was accomplished by five masked and armed bandits who rifled the hotel safe of its contents.

The Court will not interpret Article 2970 to exonerate the defendant from responsibility owing to the partial forcible means used in gaining access to Mme. Durandy's room.

## CONCLUSION

The evidence has presented the Court with the following scenario: On May 22, 1976, at 5:15 a. m., Mr. Nisberg began his wait at the Fairmont front desk for assistance. While he departed the lobby area at 5:40 a. m., Mme. Durandy and Mr. Sciclounoff continued their vigil until 5:55 a. m. Mme. Sarrat had previously attempted to obtain service during the five minute period commencing at 5:00 a. m. Neither woman was able to utilize the safe deposit system.

All reasonable inferences from this sequence of events must tend toward establishment of no other conclusion but that the Fairmont front desk was unattended during the controverted interval. Such an occurrence thus representing a lapse of the innkeeper's delictual responsibility, the Court is bound to impose liability on the Fairmont based upon its demonstrated negligence.

IT IS THEREFORE ORDERED that JUDGMENT be entered in accordance with this opinion in favor of Mme. Mathilda Durandy and against the Fairmont Roosevelt Hotel on the liability aspect of this action.